

1  Michael L. Novicoff, Esq. (SBN: 120133)
      mnovicoff@linerlaw.com
2  Daniel R. Gutenplan, Esq. (SBN: 260412)
      dgutenplan@linerlaw.com
3  LINER GRODE STEIN YANKELEVITZ
   SUNSHINE REGENSTREIF & TAYLOR LLP
4  1100 Glendon Avenue, 14th Floor
   Los Angeles, California 90024-3503
5  Telephone:  (310) 500-3500
   Facsimile:  (310) 500-3501
6

FILED
CLERK, U.S. DISTRICT COURT

MAR - 1 2010
1:16

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

7  Attorneys for Defendants
   Aaron Kaufman, Rick Schwartz, Machete's Chop
8  Shop, Inc. and Overnight Productions, LLC

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  224 ENTERTAINMENT, LLC, a          )   Case No. **CV 1 0 - 0 1 5 0 1 -DSF(VBK)**
    California Limited Liability Company, )
13                                       )
              Plaintiff,                 )   **NOTICE OF REMOVAL OF**
14                                       )   **ACTION**
       vs.                               )
15                                       )
    AARON KAUFMAN, an individual;        )
16  RICK SCHWARTZ, an individual;        )
    MACHETE'S CHOP SHOP, INC., a         )
17  Texas corporation; OVERNIGHT         )
    PRODUCTIONS, LLC, a Delaware         )
18  limited liability company; and DOES 1 )
    through 10, inclusive,               )
19                                       )
              Defendants.                )
20  _____)

21

22       **PLEASE TAKE NOTICE** that defendants Aaron Kaufman, Rick Schwartz,

23  Machete's Chop Shop, Inc. and Overnight Productions, LLC, contemporaneously

24  with the filing of this Notice, are effecting the removal of the action described below

25  from the Superior Court of the State of California for the County of Los Angeles to

26  the United States District Court for the Central District of California, pursuant to 28

27  U.S.C. §§ 1332 and 1441(b).

28

0034072/001/455296v04

## I.   PLEADINGS AND PROCESS

1.   On or about January 29, 2010, Plaintiff 224 Entertainment, LLC commenced an action in the Superior Court of the State of California for the County of Los Angeles, entitled *224 Entertainment, LLC, Plaintiff, v. Aaron Kaufman, Rick Schwartz, Machete's Chop Shop, Inc., Overnight Productions, LLC and DOES 1 through 10, inclusive, Defendants*, Case No. BC 430894 (the "Action"). Attached hereto as Exhibit "A" are true and correct copies of the Summons, Complaint and State Civil Case Cover Sheet in this Action (collectively, the "Complaint"). Attached hereto as Exhibit "B" is a true and correct copy of the Notice of Case Management Conference in this Action. Finally, attached hereto as Exhibit "C" is a true and correct copy of the Notice of Errata filed by Plaintiff 224 Entertainment, LLC in this Action on or about February 10, 2010.

2.   Exhibits "A" through "C" constitute all the process, pleadings, notices and orders delivered to any party in the Superior Court action and are hereby incorporated by reference.

3.   Defendant Overnight Productions, LLC was first served with a copy of the Complaint on February 3, 2010. Defendant Machete's Chop Shop, Inc. was first served with a copy of the Complaint on February 10, 2010. The remaining defendants, Aaron Kaufman and Rick Schwartz, have yet to be served with a copy of the Complaint.

## II.   DIVERSITY JURISDICTION

4.   This Action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by defendants pursuant to the provisions of 28 U.S.C. § 1441(b) because there was at the time of the filing of this Action, and there is now, complete diversity of citizenship between the plaintiff and defendants in this Action and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

0034072/001/455296v04

1

### A.   Citizenship of Plaintiff

2   5.   Plaintiff 224 Entertainment, LLC was, at the time of the filing of this
3   Action, and is now, a limited liability company existing under the laws of the State of
4   California, with its principal place of business located in Los Angeles, California.
5   Plaintiff 224 Entertainment, LLC has two members, Jack Gilardi, Jr. and Darby
6   Parker.  Both Jack Gilardi, Jr. and Darby Parker were at the time of the filing of this
7   Action, and are now citizens, of the State of California.

8

### B.   Citizenship of Defendants

9   6.   Defendant Aaron Kaufman was at the time of the filing of this Action,
10   and is now, a citizen of the State of New York.

11   7.   Defendant Rick Schwartz was at the time of the filing of this Action,
12   and is now, a citizen of the State of New York.

13   8.   Defendant Machete's Chop Shop, Inc. was at the time of the filing of
14   this Action, and is now, a corporation incorporated under the laws of the State of
15   Texas, with its principal place of business in the State of New York.

16   9.   Defendant Overnight Productions, LLC was at the time of the filing of
17   this Action, and is now, a limited liability company existing under the laws of the
18   State of Delaware, with its principal place of business in the State of New York.
19   Defendant Overnight Productions, LLC has four members: Rick Schwartz, Jeremy
20   Frommer, Peter Majar and Alan Bernon.  Rick Schwartz and Jeremy Frommer were
21   at the time of the filing of this Action, and are now, citizens of the State of New
22   Jersey.  Peter Majar was at the time of the filing of this Action, and is now, a citizen
23   of the State of New York.  Alan Bernon was at the time of the filing of this Action,
24   and is now, a citizen of the State of Texas.

25   10.   Accordingly, there was at the time of the filing of this Action, and there
26   is now, complete diversity of citizenship between the parties to this Action.

27

28

0034072/001/ 455296v04

1     **C.**    **Fictitious Does**

2     11.    Pursuant to 28 U.S.C. § 1441(a), the citizenship of defendants named by

3 Plaintiff 224 Entertainment, LLC under the fictitious designation "DOES 1 through

4 10" is properly disregarded for the purpose of removal.

5     **D.**    **Amount in Controversy**

6     12.    The amount in controversy exceeds the jurisdictional minimum of

7 $75,000, exclusive of interest and costs. Among other claims in the Complaint,

8 Plaintiff 224 Entertainment, LLC seeks recovery for an alleged breach of contract in

9 an amount "in excess of One Million Dollars ($1,000,000)." Complaint, ¶¶ 35.

10 **III.**    **TIMELINESS OF REMOVAL**

11     13.    Defendant Overnight Productions, LLC first received a copy of the

12 Complaint in this Action on February 3, 2010, and this Notice of Removal is timely

13 filed with this Court within 30 days of that date.

14     14.    So far as defendants are aware, no further proceedings have occurred in

15 this Action.

16     15.    For all the foregoing reasons, this Court has original jurisdiction under

17 28 U.S.C. §§ 1332 and 1441(b).

18

19 Dated: March 1, 2010           LINER GRODE STEIN YANKELEVITZ
                                     SUNSHINE REGENSTREIF & TAYLOR LLP

20

21                                 By: _____

22                                     Michael L. Novicoff
                                    Attorneys for Defendants

23

24

25

26

27

28

**EXHIBIT A**

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:** AARON KAUFMAN, an individual;
*(AVISO AL DEMANDADO):* RICK SCHWARTZ, an individual;
MACHETE'S CHOP SHOP, INC., a Texas corporation;
OVERNIGHT PRODUCTIONS, LLC, a Delaware limited
liability company; and DOES 1 through 10, inclusive

**FILED**
Los Angeles Superior Court

**JAN 29 2010**

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
SHAUNYA WESLEY

**YOU ARE BEING SUED BY PLAINTIFF:** 224 ENTERTAINMENT, LLC
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* a California
Limited Liability Company

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES
111 N. Hill Street
Los Angeles, California 90012

**CASE NUMBER:**
*(Número del Caso):*

**BC430894**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

MARTIN D. SINGER, ESQ. (SBN 78166)        TEL:310-556-3501 FAX:310-556-3615
LAVELY & SINGER PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, California 90067

DATE:        JOHN A. CLARKE        Clerk, by _____, Deputy
*(Fecha):*   JAN 29 2010   *(Secretario)*        S. WESLEY   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Legal Solutions Plus

Exhibit A Pg. 5



Exhibit A, Pg 6

1   MARTIN D. SINGER, ESQ. (Bar No. 78166)
    TODD S. EAGAN, ESQ. (Bar No. 207426)
2   LAVELY & SINGER
    PROFESSIONAL CORPORATION
3   2049 Century Park East, Suite 2400
    Los Angeles, California 90067-2906
4   Telephone: (310) 556-3501
    Facsimile: (310) 556-3615
5   Email: mdsinger@lavelysinger.com
          teagan@lavelysinger.com
6
    Attorneys for Plaintiff
7   224 Entertainment, LLC

FILED
Los Angeles Superior Court

JAN 29 2010

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
SHAUNYA WESLEY

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

11  224 ENTERTAINMENT, LLC, a          )   CASE NO.   BC 4 3 0 8 9 4
    California Limited Liability Company, )
12                                       )   COMPLAINT FOR:
            Plaintiff,                    )
13                                       )   (1)   BREACH OF CONTRACT;
        v.                               )   (2)   BREACH OF THE IMPLIED
14                                       )         COVENANT OF GOOD FAITH AND
                                         )         FAIR DEALING;
15  AARON KAUFMAN, an individual;        )   (3)   FRAUD [Intentional
    RICK SCHWARTZ, an individual;        )         Misrepresentation];
16  MACHETE'S CHOP SHOP, INC., a         )   (4)   FRAUD [Negligent Misrepresentation]
    Texas corporation; OVERNIGHT         )
17  PRODUCTIONS, LLC, a Delaware         )
    limited liability company; and DOES 1 )   [DEMAND FOR JURY TRIAL]
18  through 10, inclusive,               )
                                         )
19          Defendants.                  )
                                         )
20  _____ )

21       Plaintiff 224 ENTERTAINMENT, LLC ("224 Entertainment" and/or "Plaintiff") alleges

22  as follows:

24                              SUMMARY OF ACTION

25       1.   *Machete* is a new motion picture starring Robert DeNiro, Steven Seagal, Michelle

26  Rodriquez and Jessica Alba based on the *faux* movie trailer from the 2007 hit *Grindhouse*. It is

27  directed by Robert Rodriguez and produced by Machete's Chop Shop, Inc. ("Machete's Chop

28  Shop") and Overnight Productions, LLC ("Overnight Productions"). Aaron Kaufman

Exhibit _A_, Pg. _7_

1 ("Kaufman") and Rick Schwartz ("Schwartz") are the principals of Machete's Chop Shop and

2 Overnight Productions.

3      2.      224 Entertainment acts as an intermediary arranging surety services for motion

4 picture projects. It manages a surety program known as the IBCS Asset-Backed Film Finance

5 Surety Program. Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") are the principals of

6 224 Entertainment.

7      3.      Beginning in March 2009, 224 Entertainment was sought out by Kaufman,

8 Schwartz, Machete's Chop Shop and Overnight Productions, who requested that 224

9 Entertainment arrange surety services and bridge financing for *Machete*. 224 Entertainment

10 agreed to do so and was promised fixed and contingent compensation and film credits in return.

11      4.      Despite having successfully provided surety services and bridge financing for

12 *Machete*, Kaufman, Schwartz, Machete's Chop Shop and Overnight Productions refuse to pay 224

13 Entertainment the promised compensation and to provide the film credits.

14

15                          **THE PARTIES**

16      5.      224 Entertainment is a California Limited Liability Company, with its principal

17 place of business located in the County of Los Angeles, State of California.

18      6.      Plaintiff is informed and believes, and based thereon alleges, that Defendant

19 Kaufman is, and at all times relevant hereto was, an individual residing in the County of New

20 York, State of New York, doing business in the County of Los Angeles, State of California.

21      7.      Plaintiff is informed and believes, and based thereon alleges, that Defendant

22 Schwartz is, and at all times relevant hereto was, an individual residing in the County of New

23 York, State of New York, doing business in the County of Los Angeles, State of California.

24      8.      Plaintiff is informed and believes, and based thereon alleges, that Defendant

25 Machete's Chop Shop, Inc. is, and at all times relevant hereto was, a Texas corporation, doing

26 business in the County of Los Angeles, State of California.

27 ///

28 ///

Exhibit *A* , Pg. *8*

9.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Overnight Productions, LLC is, and at all times relevant hereto was, a Delaware limited liability company, doing business in the County of Los Angeles, State of California.

10.     Plaintiff is presently unaware of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named Defendants when the same have been ascertained. Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by their conduct. Hereinafter all Defendants including Doe Defendants will sometimes be referred to collectively as "Defendants."

11.     Plaintiff is informed and believes, and based thereon alleges that at all material times Kaufman, Schwartz, Machete's Chop Shop, Overnight Productions and Does 1 - 10, and each of them, were the agents, employees, partners, joint venturers, co-conspirators, owners, principals, and employers of the other, and each of them are, and at all times herein mentioned were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership or joint venture. Plaintiff is informed and believes, and based thereon alleges, that the acts and conduct alleged herein were known to, and authorized or ratified by, the officers, directors, and managing agents of each of the Defendants.

12.     Plaintiff is informed and believes and based thereon alleges that at all times relevant to this action there existed a unity of interest and ownership among Kaufman, Schwartz, Machete's Chop Shop, Overnight Productions, and Does 1 - 10, such that the individuality and separateness between them ceased, and that if the acts as alleged herein are treated solely as those of Machete's Chop Shop and Overnight Productions alone, an inequitable result will follow because Machete's Chop Shop and Overnight Productions are the alter ego of Kaufman, Schwartz and Does 1 - 10, and Kaufman, Schwartz and Does 1 - 10 are legally responsible for the debts and obligations of Machete's Chop Shop and Overnight Productions, in that, among other things: (a) Kaufman, Schwartz and Does 1 - 10 own and control Machete's Chop Shop and Overnight Productions, and

Exhibit  A , Pg. 9

1   Kaufman, Schwartz and Does 1 - 10 at all times relevant hereto directly controlled, dominated, used,

2   managed and operated Machete's Chop Shop and Overnight Productions, and Machete's Chop Shop

3   and Overnight Productions function and operate as a business conduit and alter ego of Kaufman,

4   Schwartz and Does 1 - 10; (b) there was a failure to comply with or observe the formalities of

5   corporate formation and/or operation of Machete's Chop Shop and Overnight Productions; (c) there

6   was a commingling of assets and obligations among Machete's Chop Shop, Overnight Productions,

7   Kaufman, Schwartz and Does 1 - 10; (d) Machete's Chop Shop and Overnight Productions are, and

8   at all times relevant hereto have been, mere shells and shams without sufficient capital assets to meet

9   their debts, obligations and liabilities; and (e) the individuality of Machete's Chop Shop, Overnight

10   Productions, Kaufman, Schwartz and Does 1 - 10 was and is a total sham and fiction.

11

12              **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

13        13.      224 Entertainment acts as an intermediary arranging surety services for motion

14   picture projects.  It manages a surety program known as the IBCS Asset-Backed Film Finance

15   Surety Program.

16        14.      On or around March 1, 2009, Kaufman, individually and on behalf of Schwartz,

17   Machete's Chop Shop and Overnight Productions, met with 224 Entertainment's principal, Parker,

18   in New York.  At the meeting, Kaufman requested that 224 Entertainment arrange a surety bond

19   and obtain bridge financing for *Machete*.  Kaufman and Parker also negotiated the general terms

20   on which 224 Entertainment would be compensated for its services.  Shortly afterward, in Los

21   Angeles, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

22   Productions, met with 224 Entertainment's principal, Gilardi, to further negotiate the general

23   terms on which 224 Entertainment would be compensated for its services.

24        15.      On or around March 22, 2009, Kaufman, individually and on behalf of Schwartz,

25   Machete's Chop Shop and Overnight Productions, contacted 224 Entertainment in Los Angeles

26   and identified the financier for *Machete*, Anthony Gudas of Tax Credit Finance ("Gudas").

27   According to Kaufman, Gudas was prepared to fund *Machete*.

28   ///

4720-2\COMPLAINT 012110

COMPLAINT

Exhibit___A___, Pg.__10__

16.     On or around May 9, 2009, 224 Entertainment arranged a meeting in Washington, D.C. for the purpose of providing additional details about the IBCS Asset-Backed Film Finance Surety Program. Kaufman and Gudas were in attendance, as were the owner of The IBCS Group, Inc., Edmund Scarborough, and its legal counsel, David Buoncristiani. At the conclusion of the meeting, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, reconfirmed that they wished to proceed and utilize the surety services of 224 Entertainment and the IBCS Asset-Backed Film Finance Surety Program.

17.     Following the May 9, 2009 meeting, on July 29, 2009, 224 Entertainment and Machete's Chop Shop entered into a written agreement dated as of May 26, 2009 and thereafter modified on August 4, 2009 (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

18.     Under the Agreement, 224 Entertainment agreed to provide surety services and bridge financing for the production of *Machete*, and to provide the executive producing services of Gilardi and Parker in connection therewith. The Agreement provided that 224 Entertainment was entitled to payment for its services upon satisfaction of the following conditions precedent:

- Delivery of the Agreement and Inducement Letter;
- Full compliance by Gilardi and Parker with IRCA requirements;
- Issuance of a completion bond for *Machete*, with an irrevocable commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price; and
- $150,000 in bridge financing obtained by 224 Entertainment via a third party investor.

19.     In return for services provided by 224 Entertainment, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, promised to pay 224 Entertainment the following:

///

///

///

- $502,025 as fixed compensation on a pay-or-play basis;
- An additional 15% of the net proceeds from *Machete* as contingent compensation; and
- 3% of all bridge financing obtained by 224 Entertainment.

Also promised were individual executive producer credits for Gilardi and Parker; company credit for 224 Entertainment; reimbursement for travel, lodging and of out-of-pocket costs; and establishment of a collection account management agreement (the "CAM") prior to the completion of principal photography of *Machete* to account to 224 Entertainment directly for its contingent compensation.

20.    Under the terms of the Agreement, payment to 224 Entertainment was due on a pay-or-play basis.  Based on the Agreement and the concurrent representations of Kaufman on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, whether or not Machete's Chop Shop ultimately proceeded with the IBCS Asset-Backed Film Finance Surety Program was not a condition precedent to payment of the money promised to 224 Entertainment.

21.    In or around late July 2009 in Los Angeles and New York, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, represented to Gilardi and Parker that Gudas had backed out of his agreement to fund *Machete*.  At that time, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, further represented and confirmed to Gilardi and Parker that the Agreement would be honored regardless of whether Gudas financed *Machete* and used the IBCS surety bond arranged by 224 Entertainment.

22.    Also at that time, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, represented to Gilardi and Parker that their services were needed to raise bridge financing immediately to support production of *Machete* until a new financier was identified.  Relying on Kaufman's representations that the Agreement remained in full force and effect, 224 Entertainment, with the approval of Kaufman, enlisted business associates and reached out to multiple sources, and obtained a bridge loan from Peter and Jerry Fruchtman in the amount of $495,000.  Kaufman, individually and on behalf of Schwartz,

1   Machete's Chop Shop and Overnight Productions, confirmed in writing that 224 Entertainment's
2   act of securing the $495,000 bridge loan satisfied the $150,000 bridge financing condition
3   precedent set forth in the Agreement.

4      23.   Also at that time, Kaufman, individually and on behalf of Schwartz, Machete's
5   Chop Shop and Overnight Productions, requested that 224 Entertainment secure an additional
6   $2,000,000 bridge loan from Perpetual Media Advisors, LLP ("Perpetual Media").   224
7   Entertainment promptly facilitated a $2,000,000 bridge loan from Perpetual Media.   Pursuant to
8   the loan terms demanded by Perpetual Media, the bridge loan was conditioned on the IBCS surety
9   bond being placed in escrow for production of *Machete*.   The $2,000,000 bridge loan would not
10  have closed without the IBCS surety bond.

11     24.   During the time 224 Entertainment was in the process of obtaining the Perpetual
12  Media bridge loan, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and
13  Overnight Productions, again represented and confirmed to Gilardi and Parker that the Agreement
14  would be honored regardless of whether Defendants used the IBCS surety bond arranged by 224
15  Entertainment in connection with the production of *Machete*.   On information and belief,
16  Defendants made this representation as part of a scheme to close the bridge loan from Perpetual
17  Media. On further information and belief, however, at the time Defendants made these
18  representations, Defendants in fact had no intention of paying 224 Entertainment its compensation
19  under the Agreement once the bridge loan closed.

20     25.   Principal photography of *Machete* commenced on August 9, 2009 and was
21  completed in late September 2009.   During the period of principal photography, Defendants
22  abruptly ceased communicating with Gilardi and Parker.   Defendants further failed and refused
23  to schedule and arrange Gilardi and Parker's location travel.

24     26.   On information and belief, in or around November 2009, a completion bond for
25  *Machete* was issued with an irrevocable commitment from the financier of *Machete* to provide funds
26  sufficient to meet the strike price.   As a result, all conditions precedent under the Agreement have
27  been met, including delivery of the Agreement and Inducement Letter; full compliance by Gilardi
28  and Parker with IRCA requirements; issuance of a completion bond for *Machete*, with an irrevocable

7

COMPLAINT

Exhibit___A___, Pg.__13

1 │ commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price; and

2 │ the arrangement of at least $150,000 in bridge financing.

3 │     27.    Despite this, Defendants continue to refuse to compensate 224 Entertainment for

4 │ its services, including payment of fixed compensation, issuance of co-executive producer credits

5 │ to Gilardi and Parker, company credit for 224 Entertainment, reimbursement for travel expenses,

6 │ and establishment of the CAM agreement for the collection of monies due to 224 Entertainment

7 │ as contingent compensation.

8 │     28.    As a result of Defendants' conduct, 224 Entertainment has been substantially

9 │ harmed.

10 │

11 │ **FIRST CAUSE OF ACTION**

12 │ **(Breach of Contract Against Machete's Chop Shop)**

13 │     29.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation

14 │ contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

15 │     30.    As alleged hereinabove, 224 Entertainment and Machete's Chop Shop, Inc. entered

16 │ into the written Agreement in 2009. See Exhibit "A," which is incorporated herein by reference.

17 │     31.    As set forth in the Agreement, 224 Entertainment agreed to provide surety services

18 │ and bridge funding for the production of *Machete*, and to provide the executive producing services

19 │ of Gilardi and Parker in connection therewith.  The Agreement further provided that 224

20 │ Entertainment was entitled to payment for its services upon satisfaction of the following conditions

21 │ precedent: delivery of the Agreement and Inducement Letter; full compliance by Gilardi and Parker

22 │ with IRCA requirements; issuance of a completion bond for *Machete*, with an irrevocable

23 │ commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price; and

24 │ $150,000 in bridge financing obtained by 224 Entertainment via a third party bridge financier.

25 │     32.    As set forth in the Agreement, Machete's Chop Shop promised to pay 224

26 │ Entertainment $502,025 as fixed compensation on a pay-or-play basis; an additional 15% of the

27 │ company's net proceeds as contingent compensation; and 3% of all bridge financing obtained by 224

28 │ Entertainment.  Also promised were individual executive producer credits for Gilardi and Parker;

COMPLAINT

Exhibit___A___, Pg. 14

1   company credit; reimbursement for travel, lodging and out-of-pocket costs; and establishment of the

2   CAM agreement to account to 224 Entertainment directly for its contingent compensation.

3        33.    Machete's Chop Shop has materially breached its duties and obligations under the

4   Agreement by failing and refusing to pay 224 Entertainment its fixed compensation, provide film

5   credits for Gilardi, Parker and 224 Entertainment, reimburse 224 Entertainment for travel and

6   other out-of-pocket expenses and establish a CAM agreement to account to 224 Entertainment.

7        34.    224 Entertainment has performed all conditions, covenants and promises required

8   pursuant to the terms of the Agreement, except to the extent such performance was waived,

9   excused or prevented by reason of the acts and omissions of Machete's Chop Shop.

10       35.    As a direct and proximate result of the failure of Machete's Chop Shop to deal fairly

11  and in good faith, 224 Entertainment has suffered and continues to suffer damages in an amount to

12  be proven at trial, but believed to be in excess of One Million Dollars ($1,000,000).   224

13  Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

14  ascertained.

15

16                          **SECOND CAUSE OF ACTION**

17                  **(For Breach of the Implied Covenant of Good Faith and**

18                     **Fair Dealing Against Machete's Chop Shop)**

19       36.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation

20  contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

21       37.    224 Entertainment fully performed all obligations, covenants and conditions to be

22  performed by it under the terms of the Agreement, except to the extent that such performance has

23  been excused or rendered impossible by the wrongful acts of and/or omissions of Machete's Chop

24  Shop.

25       38.    On information and belief, Machete's Chop Shop failed to deal fairly and in good

26  faith with 224 Entertainment by interfering with 224 Entertainment's right under the Agreement to

27  payment of fixed compensation due on a pay-or-play basis, by falsely claiming that there was no

28  deal between the parties for 224 Entertainment's services, nor any pay-or-play provision in the

9

1   Agreement, and failing and refusing to communicate with Gilardi and Parker regarding the

2   Agreement after 224 Entertainment performed its obligations thereunder.  On further information

3   and belief, Machete's Chop Shop failed to deal fairly and in good faith with 224 Entertainment by

4   exploiting 224 Entertainment and its arrangement of the IBCS surety bond for the sole purpose of

5   closing the $2,000,000 bridge loan with Perpetual Media which was conditioned on the IBCS surety

6   bond being placed in escrow.  On further information and belief, once Machete's Chop Shop had

7   obtained the $2,000,000 bridge loan, Machete's Chop Shop then proceeded to independently fund

8   *Machete* through Overnight Productions, rather than through a third party financier, electing not to

9   use the IBCS surety and on that basis claiming that Machete's Chop Shop was not obligated to pay

10  any fees to 224 Entertainment for its services arranging the IBCS surety.  In so doing, Defendants

11  failed to fulfill necessary acts that the Agreement naturally presupposed Defendants would do to

12  accomplish its purpose.

13       39.    As a direct and proximate result of the failure of Machete's Chop Shop to deal fairly

14  and in good faith, 224 Entertainment has suffered and continues to suffer damages in an amount to

15  be proven at trial, but believed to be in excess of One Million Dollars ($1,000,000).   224

16  Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

17  ascertained.

18

19                      **THIRD CAUSE OF ACTION**

20       **(For Fraud [Intentional Misrepresentation] Against All Defendants)**

21       40.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation

22  contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

23       41.    Beginning on or around March 1, 2009 and continuously thereafter up to and

24  including August 4, 2009 when the Agreement was confirmed in writing, in Los Angeles and New

25  York, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

26  Productions, made numerous representations to Gilardi and Parker, both verbally and in writing, via

27  email and telephone calls.  This included representations that if 224 Entertainment arranged a surety

28  and bridge funding for *Machete*, then 224 Entertainment would receive the following: $502,025 as

1    fixed compensation on a pay-or-play basis; an additional 15% of net proceeds from *Machete* as

2    contingent compensation; 3% of all bridge financing obtained by 224 Entertainment; individual

3    executive producer credits a and company credit; reimbursement for travel, lodging and of out-of-

4    pocket costs; and a CAM agreement for the collection of contingent compensation. Kaufman,

5    individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, further

6    represented that whether or not Machete's Chop Shop ultimately proceeded with the IBCS Asset-

7    Backed Film Finance Surety Program was not a condition precedent to payment of the money

8    promised to 224 Entertainment, and that 224 Entertainment was not responsible for delivering the

9    funding that was to be the subject of the surety.

10       42.    Subsequently, in or around late July 2009 after Gudas had backed out of the

11    agreement to fund *Machete*, Kaufman, individually and on behalf of Schwartz, Machete's Chop

12    Shop and Overnight Productions, represented to Gilardi and Parker, both verbally and in writing,

13    via email and telephone calls, in Los Angeles and New York, that the Agreement would be honored

14    regardless of whether Gudas financed *Machete* and used the IBCS surety arranged by 224

15    Entertainment.

16       43.    Each of these representations were false, and the Defendants made the representations

17    knowing they were untrue, or recklessly without knowing whether they were true or false.

18       44.    Also in or around late July 2009, Kaufman, individually and on behalf of Schwartz,

19    Machete's Chop Shop and Overnight Productions, requested that Gilardi and Parker immediately

20    raise bridge financing to support production of *Machete* until a new financier was identified. In

21    making the request for bridge financing, Kaufman, individually and on behalf of Schwartz,

22    Machete's Chop Shop and Overnight Productions, represented to Gilardi and Parker, both verbally

23    and in writing, via email and telephone calls, in Los Angeles and New York, that the Agreement

24    would be honored regardless of whether Gudas financed *Machete* and used the IBCS surety

25    arranged by 224 Entertainment. On information and belief, Kaufman, individually and on behalf

26    of Schwartz, Machete's Chop Shop and Overnight Productions, made these representations as part

27    of a scheme to facilitate a $2,000,000 bridge loan from Perpetual Media and arranged by 224

28    Entertainment, which was conditioned on the IBCS surety bond being placed in escrow. However,

4720-2\COMPLAINT 012110       COMPLAINT

Exhibit _A_, Pg. _17_

1  at the time Defendants made these representations, Defendants in fact had no intention of paying

2  224 Entertainment its compensation under the Agreement once the bridge financing was

3  confirmed.

4      45.    Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and

5  Overnight Productions, made the representations to Gilardi and Parker with an intent to defraud 224

6  Entertainment, and for the purpose of inducing 224 Entertainment to rely upon them and on that

7  basis enter into the Agreement and perform the work of obtaining a surety and bridge financing for

8  *Machete*, and to devote considerable time and effort to obtaining a surety and bridge financing for

9  *Machete*.

10      46.    Gilardi and Parker were unaware of the falsity of the above-described representations

11  and, given the professional reputation of Defendants as experienced film-makers and their assurances

12  to Gilardi and Parker that they would compensate 224 Entertainment for its services, Gilardi and

13  Parker, on behalf of 224 Entertainment, with justification acted in reliance upon the truth of the

14  representations by entering into the Agreement, performing the work of obtaining a surety and bridge

15  financing for *Machete*, and in refraining from pursuing or accepting alternative projects.

16      47.    As a direct and proximate result of his reliance upon the truth of the representations,

17  224 Entertainment has suffered and continues to suffer damages in an amount to be proven at trial,

18  but is believed to be in excess of One Million Dollars ($1,000,000).  224 Entertainment will seek

19  leave to amend this Complaint to allege the precise amount when same is ascertained.

20      48.    The aforementioned acts of Defendants, and each of them, were done intentionally

21  or with a conscious disregard of the rights of 224 Entertainment, and with the intent to vex, injure,

22  or annoy 224 Entertainment such as to constitute oppression, fraud, or malice, and that such conduct

23  was authorized, ratified, and adopted by the officers, directors, and/or managing agents of

24  Defendants, and each of them.  Thus, 224 Entertainment is entitled to exemplary and punitive

25  damages in an amount appropriate to punish or set an example of Defendants and to deter such

26  conduct by them and others in the future, according to proof at trial.

27  ///

28  ///

Exhibit _A_ , Pg. _19_

## FOURTH CAUSE OF ACTION

### (For Fraud [Negligent Misrepresentation] Against All Defendants)

49.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

50.    224 Entertainment is informed and believes and based thereon alleges that to the extent that the Court determines that Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, did not intentionally make the representations alleged in Paragraphs 41-44, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, negligently and carelessly made the representations to Gilardi and Parker.

51.    224 Entertainment is informed and believes and based thereon alleges that the above representations were made by Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, without any reasonable ground for believing them to be true.

52.    224 Entertainment is informed and believes and based thereon alleges that each of the above representations were made by Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, with an intent to induce 224 Entertainment to rely thereon and did induce 224 Entertainment to enter into the Agreement, perform the work of obtaining a surety and bridge financing for *Machete*, and refrain from pursuing or accepting alternative projects.

53.    At the time or times Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, made these representations, 224 Entertainment was ignorant of the falsity of the representations and reasonably and justifiably believed them to be true.

54.    In reliance upon the representations, 224 Entertainment was induced to do, and did, the acts alleged herein including, but not limited to, entering into the Agreement, performing the work of obtaining a surety and bridge financing for *Machete*, and refraining from pursuing or accepting alternative projects.

55.    224 Entertainment's reliance upon the representations was justified and reasonable.

///

///

13

Exhibit _A_, Pg. _20_

1    56.    As a direct, proximate and reasonably foreseeable result of the negligent

2  misrepresentations, 224 Entertainment has suffered and continues to suffer damages in an amount

3  to be proven at trial, but is believed to be in excess of One Million Dollars ($1,000,000).  224

4  Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

5  ascertained.

6

7    **WHEREFORE,** Plaintiff prays for judgment against Defendants, and each of them, jointly

8  and severally, as follows:

9  **AS TO THE FIRST CAUSE OF ACTION**:

10    1.    For an award of general, special, and consequential damages against Defendants in

11  an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

12  the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

13  **AS TO THE SECOND CAUSE OF ACTION**:

14    2.    For an award of general, special, and consequential damages against Defendants in

15  an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

16  the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

17  **AS TO THE THIRD CAUSE OF ACTION**:

18    3.    For an award of general, special, and consequential damages against Defendants in

19  an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

20  the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

21    4.    For punitive damages pursuant to Civil Code § 3294 in an amount appropriate to

22  punish or set an example of Defendants, and to deter such conduct in the future, the exact amount

23  of such damages subject to proof at time of trial;

24  **AS TO THE FOURTH CAUSE OF ACTION**:

25    5.    For an award of general, special, and consequential damages against Defendants in

26  an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

27  the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

28  ///

14

Exhibit _A_, Pg. _21_

**AS TO ALL CAUSES OF ACTION:**

1. For costs of suit herein;

2. For interest on the above-requested general, special and the maximum legal rate as provided by law; and

3. For such other additional relief as the Court deems just and proper.

DATED:  January 29, 2010

Respectfully submitted,

MARTIN D. SINGER
TODD S. EAGAN
LAVELY & SINGER
PROFESSIONAL CORPORATION

By: _____
        MARTIN D. SINGER
Attorneys for Plaintiff 22/ ENTERTAINMENT, LLC

15

COMPLAINT

## REQUEST FOR JURY TRIAL

Plaintiff 224 Entertainment, LLC hereby requests a trial by jury.

DATED: January 29, 2010

Respectfully submitted,

MARTIN D. SINGER
TODD S. EAGAN
LAVELY & SINGER
PROFESSIONAL CORPORATION

By: _____
        MARTIN D. SINGER
Attorneys for Plaintiff 224 ENTERTAINMENT,
LLC

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name,* ● *Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| MARTIN D. SINGER (SBN 78166)<br>TODD S. EAGAN (SBN 207426)<br>LAVELY & SINGER PROFESSIONAL CORPORATION<br>2049 Century Park East, Suite 2400<br>Los Angeles, California 90067<br>TELEPHONE NO.: 310-556-3501   FAX NO.: (310) 556-3615<br>ATTORNEY FOR *(Name):* Plaintiff, 224 ENTERTAINMENT, LLC | **FILED**<br>Los Angeles Superior Court<br><br>JAN 29 2010<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____ , Deputy<br>SHAUNYA WESLEY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: (same)
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: CENTRAL

CASE NAME: 224 ENTERTAINMENT v. AARON KAUFMAN, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited     [ ] Limited<br>(Amount        (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **BC430894**<br>JUDGE:<br>DEPT: |

Items 1-6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel  e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve            in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence         f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* Four (4)
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*
Date: January 29, 2010

MARTIN D. SINGER                                     ▶ _____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

ORIGINAL

Exhibit ___A___, Pg. __24__

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                      CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary cause of action**. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice— Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach—Seller Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award (*not unpaid taxes*)
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint Case (*non-tort/non-complex*)
  Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]          **CIVIL CASE COVER SHEET**                    Page 2 of 2

Exhibit ___A___, Pg. _25_

| SHORT TITLE: 224 ENTERTAINMENT v. AARON KAUFMAN, et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I.  Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES   CLASS ACTION? [ ] YES   LIMITED CASE? [ ] YES   TIME ESTIMATED FOR TRIAL **5** [ ] HOURS/ [X] DAYS

Item II.  Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

> ### Applicable Reasons for Choosing Courthouse Location (See Column C below)
>
> 1. Class Actions must be filed in the County Courthouse, Central District.
> 2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
> 3. Location where cause of action arose.
> 4. Location where bodily injury, death or damage occurred.
> 5. Location where performance required or defendant resides.
> 6. Location of property or permanently garaged vehicle.
> 7. Location where petitioner resides.
> 8. Location wherein defendant/respondent functions wholly.
> 9. Location where one or more of the parties reside.
> 10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | [ ] A6070  Asbestos Property Damage | 2. |
| | | [ ] A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice<br>(45) | [ ] A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | [ ] A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | [ ] A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013  Fraud (no contract) | 1., 2., 3. |

ORIGINAL

| LACIV 109 (Rev. 01/07)<br>LASC Approved 03-04 | CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION | LASC, rule 2.0<br>Page 1 of 4<br>LA-481 |
|---|---|---|

Exhibit  A , Pg 26

SHORT TITLE:  224 ENTERTAINMENT v. AARON KAUFMAN, et al.    | CASE NUMBER

| A<br>Civil Case Cover<br>Sheet Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|
| **Professional Negligence (25)** | ☐ | A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ | A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| **Other (35)** | ☐ | A6025 Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Wrongful Termination (36)** | ☐ | A6037  Wrongful Termination | 1., 2., 3. |
| **Other Employment (15)** | ☐ | A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ | A6109  Labor Commissioner Appeals | 10. |
| **Breach of Contract/ Warranty (06) (not insurance)** | ☐ | A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ | A6008   Contract/Warranty Breach –Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ | A6019   Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ | A6028   Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| **Collections (09)** | ☐ | A6002   Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ | A6012   Other Promissory Note/Collections Case | 2., 5. |
| **Insurance Coverage (18)** | ☐ | A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| **Other Contract (37)** | ☒ | A6009   Contractual Fraud | 1., ②, 3., 5. |
| | ☐ | A6031   Tortious Interference | 1., 2., 3., 5. |
| | ☐ | A6027   Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Eminent Domain/Inverse Condemnation (14)** | ☐ | A7300   Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| **Wrongful Eviction (33)** | ☐ | A6023   Wrongful Eviction Case | 2., 6. |
| **Other Real Property (26)** | ☐ | A6018   Mortgage Foreclosure | 2., 6. |
| | ☐ | A6032   Quiet Title | 2. ,6. |
| | ☐ | A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer - Commercial (31)** | ☐ | A6021   Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer - Residential (32)** | ☐ | A6020   Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer - Drugs (38)** | ☐ | A6022   Unlawful Detainer-Drugs | 2., 6. |
| **Asset Forfeiture (05)** | ☐ | A6108   Asset Forfeiture Case | 2., 6. |
| **Petition re Arbitration (11)** | ☐ | A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

Side labels (top to bottom): Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) · Employment · Contract · Real Property · Unlawful Detainer · Judicial Review

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

● IVIL CASE COVER SHEET ADDEND ●
AND STATEMENT OF LOCATION

LASC, rule 2.0
Page 2 of 4

Exhibit___A___, Pg. 27

SHORT TITLE: 224 ENTERTAINMENT v. AARON KAUFMAN, et al.

CASE NUMBER

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | | | |
| Writ of Mandate<br>(02) | | A6151  Writ - Administrative Mandamus | 2., 8. |
| | | A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | A6153  Writ - Other Limited Court Case Review | 2. |
| Other Judicial Review<br>(39) | | A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | | | |
| Antitrust/Trade<br>Regulation (03) | | A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| Construction Defect (10) | | A6007  Construction defect | 1., 2., 3. |
| Claims Involving Mass<br>Tort (40) | | A6006  Claims Involving Mass Tort | 1., 2., 8. |
| Securities Litigation (28) | | A6035  Securities Litigation Case | 1., 2., 8. |
| Toxic Tort<br>Environmental (30) | | A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| Insurance Coverage<br>Claims from Complex<br>Case (41) | | A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | | | |
| Enforcement<br>of Judgment<br>(20) | | A6141  Sister State Judgment | 2., 9. |
| | | A6160  Abstract of Judgment | 2., 6. |
| | | A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | | | |
| RICO (27) | | A6033  Racketeering (RICO) Case | 1., 2., 8. |
| Other Complaints<br>(Not Specified Above)<br>(42) | | A6030  Declaratory Relief Only | 1., 2., 8. |
| | | A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | | | |
| Partnership Corporation<br>Governance (21) | | A6113  Partnership and Corporate Governance Case | 2., 8. |
| Other Petitions<br>(Not Specified Above)<br>(43) | | A6121  Civil Harassment | 2., 3., 9. |
| | | A6123  Workplace Harassment | 2., 3., 9. |
| | | A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | A6190  Election Contest | 2. |
| | | A6110  Petition for Change of Name | 2., 7. |
| | | A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

Exhibit ___A___, Pg 28

| SHORT TITLE: 224 ENTERTAINMENT v. AARON KAUFMAN, *et al.* | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 9454 Wilshire Boulevard |

| CITY: | STATE: | ZIP CODE: | |
|---|---|---|---|
| Beverly Hills | CA | 90212 | |

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the **STANLEY MOSK** _____ courthouse in the _____**CENTRAL**_____ District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: **January 29, 2010**

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)
**MARTIN D. SINGER**

---

## PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**VIL CASE COVER SHEET ADDEND**
**AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 4 of 4

Exhibit __A__, Pg. __29__

**EXHIBIT B**

NOTICE SENT TO:

Singer, Martin D., Esq.
Lavely & Singer Professional Corp.
2049 Century Park East, Suite 2400
Los Angeles,        CA  90067-2906

**● FILED**

LOS ANGELES SUPERIOR COURT

FEB 0 3 2010

JOHN A. CLARKE, CLERK

BY MARISOL LOMELI, DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| 224 ENTERTAINMENT LLC | Plaintiff(s), | **CASE NUMBER** |
| VS. | | BC430894 |
| AARON KAUFMAN ET AL | Defendant(s). | **NOTICE OF CASE MANAGEMENT CONFERENCE** |

**TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:**

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for  May 6, 2010  at  8:30 am  in  Dept. 49  at 111 N. Hill Street, Los Angeles, California 90012.

Pursuant to California Rules of Court, 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.  You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order dismissing fictitious/unnamed defendants; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (GC 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, CCP Sections 177.5, 575.2, 583.150, 583.360 and 583.410, GC Section 68608 (b), and California Rules of Court 2.2 et seq.

Date:  February 3, 2010

Judicial Officer
**CONRAD RICHARD ARAGON**

### CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[✓] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[  ] by personally giving the party notice upon filing the complaint.

Date:  February 3, 2010

John A. Clarke, Executive Officer/Clerk

by _____, Deputy Clerk

LACIV 132 (Rev. 01/07)
LASC Approved 10-03

Cal. Rules of Court, rule 3.720-3.730
LASC Local Rules, Chapter Seven

Exhibit  B , Pg. 30

**EXHIBIT C**

1  MARTIN D. SINGER, ESQ. (Bar No. 78166)
   TODD S. EAGAN, ESQ. (Bar No. 207426)
2  LAVELY & SINGER
   PROFESSIONAL CORPORATION
3  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
4  Telephone: (310) 556-3501
   Facsimile: (310) 556-3615
5  Email: mdsinger@lavelysinger.com
         teagan@lavelysinger.com
6
   Attorneys for Plaintiff
7  224 Entertainment, LLC

8

9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10          FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

11

12  224 ENTERTAINMENT, LLC, a          )   CASE NO.  BC 430894
    California Limited Liability Company, )
13                                      )   [Hon. Conrad Aragon – Dept. 49]
                                        )
            Plaintiff,                  )
14                                      )   **NOTICE OF ERRATA**
        v.                              )
15                                      )   **RE: PLAINTIFF'S COMPLAINT**
                                        )
16  AARON KAUFMAN, an individual;       )
    RICK SCHWARTZ, an individual;       )
17  MACHETE'S CHOP SHOP, INC., a        )
    Texas corporation; OVERNIGHT        )   [Complaint filed: January 29, 2010]
18  PRODUCTIONS, LLC, a Delaware        )
    limited liability company; and DOES 1 )
19  through 10, inclusive,              )
                                        )
20          Defendants.                 )
                                        )
21  _____ )

22

23

24

25

26

27

28

FILED
LOS ANGELES SUPERIOR COURT

FEB 10 2010

JOHN A. CLARKE, CLERK

BY RAUL SANCHEZ, DEPUTY

ORIGINAL

Exhibit _C_, Pg. _31_

4720-2\NTC ERRATA 021010                    NTC OF ERRATA RE: COMPLAINT

1   TO THE ABOVE-CAPTIONED COURT AND TO ALL PARTIES AND THEIR

2   ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that Plaintiff 224 Entertainment, LLC's Complaint, filed on

4   January 29, 2010, inadvertently omitted Exhibit "A" due to a clerical error. Attached hereto is

5   a complete copy of the Complaint, which includes Exhibit "A."

6       We apologize for any inconvenience this error causes the Court or counsel.

7

8   DATED: February 10, 2010        MARTIN D. SINGER
                                      TODD S. EAGAN
9                                     LAVELY & SINGER
                                      PROFESSIONAL CORPORATION
10

11

12                                    By: _Todd S. Eagan_____
                                          TODD S. EAGAN
13                                    Attorneys for Plaintiff 224 ENTERTAINMENT,
                                      LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit __C__, P. 32

4720-2\NTC ERRATA 021010                     NTC OF ERRATA RE: COMPLAINT

1 | MARTIN D. SINGER, ESQ. (Bar No. 78166)
TODD S. EAGAN, ESQ. (Bar No. 207426)
2 | **LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
3 | 2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
4 | Telephone: (310) 556-3501
Facsimile: (310) 556-3615
5 | Email: mdsinger@lavelysinger.com
teagan@lavelysinger.com
6
Attorneys for Plaintiff
7 | 224 Entertainment, LLC

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 29 2010

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
SHAUNYA WESLEY

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

10

11 | 224 ENTERTAINMENT, LLC, a
California Limited Liability Company,
12 |                                    )   CASE NO.
              Plaintiff,              )   COMPLAINT FOR BC 430894
13 |                                    )
          v.                          )   (1)   **BREACH OF CONTRACT;**
14 |                                    )   (2)   **BREACH OF THE IMPLIED**
                                      )         **COVENANT OF GOOD FAITH AND**
15 | AARON KAUFMAN, an individual;      )         **FAIR DEALING;**
RICK SCHWARTZ, an individual;         )   (3)   **FRAUD [Intentional**
16 | MACHETE'S CHOP SHOP, INC., a       )         **Misrepresentation];**
Texas corporation; OVERNIGHT         )   (4)   **FRAUD [Negligent Misrepresentation]**
17 | PRODUCTIONS, LLC, a Delaware       )
limited liability company; and DOES 1 )
18 | through 10, inclusive,             )         **[DEMAND FOR JURY TRIAL]**
                                      )
19 |              Defendants.          )
                                      )
20 | _____)

21 |       Plaintiff 224 ENTERTAINMENT, LLC ("224 Entertainment" and/or "Plaintiff") alleges

22 | as follows:

23

24 |                              **SUMMARY OF ACTION**

25 |       1.    *Machete* is a new motion picture starring Robert DeNiro, Steven Seagal, Michelle

26 | Rodriquez and Jessica Alba based on the *faux* movie trailer from the 2007 hit *Grindhouse*. It is

27 | directed by Robert Rodriguez and produced by Machete's Chop Shop, Inc. ("Machete's Chop

28 | Shop") and Overnight Productions, LLC ("Overnight Productions"). Aaron Kaufman

1   ("Kaufman") and Rick Schwartz ("Schwartz") are the principals of Machete's Chop Shop and

2   Overnight Productions.

3       2.     224 Entertainment acts as an intermediary arranging surety services for motion

4   picture projects.  It manages a surety program known as the IBCS Asset-Backed Film Finance

5   Surety Program.  Jack Gilardi, Jr. ("Gilardi")  and Darby Parker ("Parker") are the principals of

6   224 Entertainment.

7       3.     Beginning in March 2009, 224 Entertainment was sought out by Kaufman,

8   Schwartz, Machete's Chop Shop and Overnight Productions, who requested that 224

9   Entertainment arrange surety services and bridge financing for *Machete*.  224 Entertainment

10   agreed to do so and was promised fixed and contingent compensation and film credits in return.

11       4.     Despite having successfully provided surety services and bridge financing for

12   *Machete*, Kaufman, Schwartz, Machete's Chop Shop and Overnight Productions refuse to pay 224

13   Entertainment the promised compensation and to provide the film credits.

14

15                         **THE PARTIES**

16       5.     224 Entertainment is a California Limited Liability Company, with its principal

17   place of business located in the County of Los Angeles, State of California.

18       6.     Plaintiff is informed and believes, and based thereon alleges, that Defendant

19   Kaufman is, and at all times relevant hereto was, an individual residing in the County of New

20   York, State of New York, doing business in the County of Los Angeles, State of California.

21       7.     Plaintiff is informed and believes, and based thereon alleges, that Defendant

22   Schwartz is, and at all times relevant hereto was, an individual residing in the County of New

23   York, State of New York, doing business in the County of Los Angeles, State of California.

24       8.     Plaintiff is informed and believes, and based thereon alleges, that Defendant

25   Machete's Chop Shop, Inc. is, and at all times relevant hereto was, a Texas corporation, doing

26   business in the County of Los Angeles, State of California.

27   ///

28   ///

Exhibit __C__ , Pg. __34__

1    9.    Plaintiff is informed and believes, and based thereon alleges, that Defendant

2    Overnight Productions, LLC is, and at all times relevant hereto was, a Delaware limited liability

3    company, doing business in the County of Los Angeles, State of California.

4    10.    Plaintiff is presently unaware of the true names and capacities of Defendants sued

5    herein as Does 1 through 10, inclusive, and therefore sues said Defendants by such fictitious

6    names.  Plaintiff will amend this Complaint to allege the true names and capacities of such

7    fictitiously named Defendants when the same have been ascertained.  Plaintiff is informed and

8    believes and based thereon alleges that each of the fictitiously named Defendants is responsible

9    in some manner for the occurrences, acts and omissions alleged herein and that Plaintiff's damages

10   were proximately caused by their conduct.  Hereinafter all Defendants including Doe Defendants

11   will sometimes be referred to collectively as "Defendants."

12   11.    Plaintiff is informed and believes, and based thereon alleges that at all material times

13   Kaufman, Schwartz, Machete's Chop Shop, Overnight Productions and Does 1 - 10, and each of

14   them, were the agents, employees, partners, joint venturers, co-conspirators, owners, principals, and

15   employers of the other, and each of them are, and at all times herein mentioned were, acting within

16   the course and scope of that agency, employment, partnership, conspiracy, ownership or joint

17   venture.  Plaintiff is informed and believes, and based thereon alleges, that the acts and conduct

18   alleged herein were known to, and authorized or ratified by, the officers, directors, and managing

19   agents of each of the Defendants.

20   12.    Plaintiff is informed and believes and based thereon alleges that at all times relevant

21   to this action there existed a unity of interest and ownership among Kaufman, Schwartz, Machete's

22   Chop Shop, Overnight Productions, and Does 1 - 10, such that the individuality and separateness

23   between them ceased, and that if the acts as alleged herein are treated solely as those of Machete's

24   Chop Shop and Overnight Productions alone, an inequitable result will follow because Machete's

25   Chop Shop and Overnight Productions are the alter ego of Kaufman, Schwartz and Does 1 - 10, and

26   Kaufman, Schwartz and Does 1 - 10 are legally responsible for the debts and obligations of

27   Machete's Chop Shop and Overnight Productions, in that, among other things: (a) Kaufman,

28   Schwartz and Does 1 - 10 own and control Machete's Chop Shop and Overnight Productions, and

1  Kaufman, Schwartz and Does 1 - 10 at all times relevant hereto directly controlled, dominated, used,

2  managed and operated Machete's Chop Shop and Overnight Productions, and Machete's Chop Shop

3  and Overnight Productions function and operate as a business conduit and alter ego of Kaufman,

4  Schwartz and Does 1 - 10; (b) there was a failure to comply with or observe the formalities of

5  corporate formation and/or operation of Machete's Chop Shop and Overnight Productions; (c) there

6  was a commingling of assets and obligations among Machete's Chop Shop, Overnight Productions,

7  Kaufman, Schwartz and Does 1 - 10; (d) Machete's Chop Shop and Overnight Productions are, and

8  at all times relevant hereto have been, mere shells and shams without sufficient capital assets to meet

9  their debts, obligations and liabilities; and (e) the individuality of Machete's Chop Shop, Overnight

10  Productions, Kaufman, Schwartz and Does 1 - 10 was and is a total sham and fiction.

11

12  **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

13       13.     224 Entertainment acts as an intermediary arranging surety services for motion

14  picture projects.  It manages a surety program known as the IBCS Asset-Backed Film Finance

15  Surety Program.

16       14.     On or around March 1, 2009, Kaufman, individually and on behalf of Schwartz,

17  Machete's Chop Shop and Overnight Productions, met with 224 Entertainment's principal, Parker,

18  in New York.  At the meeting, Kaufman requested that 224 Entertainment arrange a surety bond

19  and obtain bridge financing for *Machete*.  Kaufman and Parker also negotiated the general terms

20  on which 224 Entertainment would be compensated for its services.  Shortly afterward, in Los

21  Angeles, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

22  Productions, met with 224 Entertainment's principal, Gilardi, to further negotiate the general

23  terms on which 224 Entertainment would be compensated for its services.

24       15.     On or around March 22, 2009, Kaufman, individually and on behalf of Schwartz,

25  Machete's Chop Shop and Overnight Productions, contacted 224 Entertainment in Los Angeles

26  and identified the financier for *Machete*, Anthony Gudas of Tax Credit Finance ("Gudas").

27  According to Kaufman, Gudas was prepared to fund *Machete*.

28  ///

Exhibit __C__, Pg. __36__

1    16.    On or around May 9, 2009, 224 Entertainment arranged a meeting in Washington,

2  D.C. for the purpose of providing additional details about the IBCS Asset-Backed Film Finance

3  Surety Program. Kaufman and Gudas were in attendance, as were the owner of The IBCS Group,

4  Inc., Edmund Scarborough, and its legal counsel, David Buoncristiani. At the conclusion of the

5  meeting, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

6  Productions, reconfirmed that they wished to proceed and utilize the surety services of 224

7  Entertainment and the IBCS Asset-Backed Film Finance Surety Program.

8    17.    Following the May 9, 2009 meeting, on July 29, 2009, 224 Entertainment and

9  Machete's Chop Shop entered into a written agreement dated as of May 26, 2009 and thereafter

10  modified on August 4, 2009 (the "Agreement"). A true and correct copy of the Agreement is

11  attached hereto as Exhibit "A" and incorporated herein by this reference.

12    18.    Under the Agreement, 224 Entertainment agreed to provide surety services and bridge

13  financing for the production of *Machete*, and to provide the executive producing services of Gilardi

14  and Parker in connection therewith. The Agreement provided that 224 Entertainment was entitled

15  to payment for its services upon satisfaction of the following conditions precedent:

16         •    Delivery of the Agreement and Inducement Letter;

17         •    Full compliance by Gilardi and Parker with IRCA requirements;

18         •    Issuance of a completion bond for *Machete*, with an irrevocable commitment

19              from the financiers of *Machete* to provide funds sufficient to meet the strike

20              price; and

21         •    $150,000 in bridge financing obtained by 224 Entertainment via a third party

22              investor.

23    19.    In return for services provided by 224 Entertainment, Kaufman, individually and

24  on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, promised to pay 224

25  Entertainment the following:

26  ///

27  ///

28  ///

1          •     $502,025 as fixed compensation on a pay-or-play basis;

2          •     An additional 15% of the net proceeds from *Machete* as contingent

3                compensation; and

4          •     3% of all bridge financing obtained by 224 Entertainment.

5    Also promised were individual executive producer credits for Gilardi and Parker; company credit

6    for 224 Entertainment; reimbursement for travel, lodging and of out-of-pocket costs; and

7    establishment of a collection account management agreement (the "CAM") prior to the completion

8    of principal photography of *Machete* to account to 224 Entertainment directly for its contingent

9    compensation.

10         20.    Under the terms of the Agreement, payment to 224 Entertainment was due on a pay-

11   or-play basis.  Based on the Agreement and the concurrent representations of Kaufman on behalf

12   of Schwartz, Machete's Chop Shop and Overnight Productions, whether or not Machete's Chop

13   Shop ultimately proceeded with the IBCS Asset-Backed Film Finance Surety Program was not a

14   condition precedent to payment of the money promised to 224 Entertainment.

15         21.    In or around late July 2009 in Los Angeles and New York, Kaufman, individually

16   and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, represented to

17   Gilardi and Parker that Gudas had backed out of his agreement to fund *Machete*.  At that time,

18   Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

19   Productions, further represented and confirmed to Gilardi and Parker that the Agreement would

20   be honored regardless of whether Gudas financed *Machete* and used the IBCS surety bond

21   arranged by 224 Entertainment.

22         22.    Also at that time, Kaufman, individually and on behalf of Schwartz, Machete's

23   Chop Shop and Overnight Productions, represented to Gilardi and Parker that their services were

24   needed to raise bridge financing immediately to support production of *Machete* until a new

25   financier was identified.  Relying on Kaufman's representations that the Agreement remained in

26   full force and effect, 224 Entertainment, with the approval of Kaufman, enlisted business

27   associates and reached out to multiple sources, and obtained a bridge loan from Peter and Jerry

28   Fruchtman in the amount of $495,000.  Kaufman, individually and on behalf of Schwartz,

Exhibit____C____, Pg. 38

1  Machete's Chop Shop and Overnight Productions, confirmed in writing that 224 Entertainment's
2  act of securing the $495,000 bridge loan satisfied the $150,000 bridge financing condition
3  precedent set forth in the Agreement.

4      23.    Also at that time, Kaufman, individually and on behalf of Schwartz, Machete's
5  Chop Shop and Overnight Productions, requested that 224 Entertainment secure an additional
6  $2,000,000 bridge loan from Perpetual Media Advisors, LLP ("Perpetual Media").  224
7  Entertainment promptly facilitated a $2,000,000 bridge loan from Perpetual Media.  Pursuant to
8  the loan terms demanded by Perpetual Media, the bridge loan was conditioned on the IBCS surety
9  bond being placed in escrow for production of *Machete*.  The $2,000,000 bridge loan would not
10  have closed without the IBCS surety bond.

11      24.    During the time 224 Entertainment was in the process of obtaining the Perpetual
12  Media bridge loan, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and
13  Overnight Productions, again represented and confirmed to Gilardi and Parker that the Agreement
14  would be honored regardless of whether Defendants used the IBCS surety bond arranged by 224
15  Entertainment in connection with the production of *Machete*.  On information and belief,
16  Defendants made this representation as part of a scheme to close the bridge loan from Perpetual
17  Media. On further information and belief, however, at the time Defendants made these
18  representations, Defendants in fact had no intention of paying 224 Entertainment its compensation
19  under the Agreement once the bridge loan closed.

20      25.    Principal photography of *Machete* commenced on August 9, 2009 and was
21  completed in late September 2009.  During the period of principal photography, Defendants
22  abruptly ceased communicating with Gilardi and Parker.  Defendants further failed and refused
23  to schedule and arrange Gilardi and Parker's location travel.

24      26.    On information and belief, in or around November 2009, a completion bond for
25  *Machete* was issued with an irrevocable commitment from the financier of *Machete* to provide funds
26  sufficient to meet the strike price.  As a result, all conditions precedent under the Agreement have
27  been met, including delivery of the Agreement and Inducement Letter; full compliance by Gilardi
28  and Parker with IRCA requirements; issuance of a completion bond for *Machete*, with an irrevocable

7

Exhibit C , Pg. 39

1 | commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price; and

2 | the arrangement of at least $150,000 in bridge financing.

3 |     27.    Despite this, Defendants continue to refuse to compensate 224 Entertainment for

4 | its services, including payment of fixed compensation, issuance of co-executive producer credits

5 | to Gilardi and Parker, company credit for 224 Entertainment, reimbursement for travel expenses,

6 | and establishment of the CAM agreement for the collection of monies due to 224 Entertainment

7 | as contingent compensation.

8 |     28.    As a result of Defendants' conduct, 224 Entertainment has been substantially

9 | harmed.

10 |

11 | **FIRST CAUSE OF ACTION**

12 | **(Breach of Contract Against Machete's Chop Shop)**

13 |     29.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation

14 | contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

15 |     30.    As alleged hereinabove, 224 Entertainment and Machete's Chop Shop, Inc. entered

16 | into the written Agreement in 2009. See Exhibit "A," which is incorporated herein by reference.

17 |     31.    As set forth in the Agreement, 224 Entertainment agreed to provide surety services

18 | and bridge funding for the production of *Machete*, and to provide the executive producing services

19 | of Gilardi and Parker in connection therewith.  The Agreement further provided that 224

20 | Entertainment was entitled to payment for its services upon satisfaction of the following conditions

21 | precedent: delivery of the Agreement and Inducement Letter; full compliance by Gilardi and Parker

22 | with IRCA requirements; issuance of a completion bond for *Machete*, with an irrevocable

23 | commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price; and

24 | $150,000 in bridge financing obtained by 224 Entertainment via a third party bridge financier.

25 |     32.    As set forth in the Agreement, Machete's Chop Shop promised to pay 224

26 | Entertainment $502,025 as fixed compensation on a pay-or-play basis; an additional 15% of the

27 | company's net proceeds as contingent compensation; and 3% of all bridge financing obtained by 224

28 | Entertainment. Also promised were individual executive producer credits for Gilardi and Parker;

8

Exhibit _C_, Pg. _40_

1   company credit; reimbursement for travel, lodging and out-of-pocket costs; and establishment of the

2   CAM agreement to account to 224 Entertainment directly for its contingent compensation.

3       33.   Machete's Chop Shop has materially breached its duties and obligations under the

4   Agreement by failing and refusing to pay 224 Entertainment its fixed compensation, provide film

5   credits for Gilardi, Parker and 224 Entertainment, reimburse 224 Entertainment for travel and

6   other out-of-pocket expenses and establish a CAM agreement to account to 224 Entertainment.

7       34.   224 Entertainment has performed all conditions, covenants and promises required

8   pursuant to the terms of the Agreement, except to the extent such performance was waived,

9   excused or prevented by reason of the acts and omissions of Machete's Chop Shop.

10       35.   As a direct and proximate result of the failure of Machete's Chop Shop to deal fairly

11   and in good faith, 224 Entertainment has suffered and continues to suffer damages in an amount to

12   be proven at trial, but believed to be in excess of One Million Dollars ($1,000,000).   224

13   Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

14   ascertained.

15

16   **SECOND CAUSE OF ACTION**

17   **(For Breach of the Implied Covenant of Good Faith and**

18   **Fair Dealing Against Machete's Chop Shop)**

19       36.   Plaintiff repeats, realleges, adopts and incorporates each and every allegation

20   contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

21       37.   224 Entertainment fully performed all obligations, covenants and conditions to be

22   performed by it under the terms of the Agreement, except to the extent that such performance has

23   been excused or rendered impossible by the wrongful acts of and/or omissions of Machete's Chop

24   Shop.

25       38.   On information and belief, Machete's Chop Shop failed to deal fairly and in good

26   faith with 224 Entertainment by interfering with 224 Entertainment's right under the Agreement to

27   payment of fixed compensation due on a pay-or-play basis,  by falsely claiming that there was no

28   deal between the parties for 224 Entertainment's services, nor any pay-or-play provision in the

9

1   Agreement, and failing and refusing to communicate with Gilardi and Parker regarding the

2   Agreement after 224 Entertainment performed its obligations thereunder.  On further information

3   and belief, Machete's Chop Shop failed to deal fairly and in good faith with 224 Entertainment by

4   exploiting 224 Entertainment and its arrangement of the IBCS surety bond for the sole purpose of

5   closing the $2,000,000 bridge loan with Perpetual Media which was conditioned on the IBCS surety

6   bond being placed in escrow.  On further information and belief, once Machete's Chop Shop had

7   obtained the $2,000,000 bridge loan, Machete's Chop Shop then proceeded to independently fund

8   *Machete* through Overnight Productions, rather than through a third party financier, electing not to

9   use the IBCS surety and on that basis claiming that Machete's Chop Shop was not obligated to pay

10  any fees to 224 Entertainment for its services arranging the IBCS surety.  In so doing, Defendants

11  failed to fulfill necessary acts that the Agreement naturally presupposed Defendants would do to

12  accomplish its purpose.

13      39.     As a direct and proximate result of the failure of Machete's Chop Shop to deal fairly

14  and in good faith, 224 Entertainment has suffered and continues to suffer damages in an amount to

15  be proven at trial, but believed to be in excess of One Million Dollars ($1,000,000).   224

16  Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

17  ascertained.

18

19                          **THIRD CAUSE OF ACTION**

20          **(For Fraud [Intentional Misrepresentation] Against All Defendants)**

21      40.     Plaintiff repeats, realleges, adopts and incorporates each and every allegation

22  contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

23      41.     Beginning on or around March 1, 2009 and continuously thereafter up to and

24  including August 4, 2009 when the Agreement was confirmed in writing, in Los Angeles and New

25  York, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

26  Productions, made numerous representations to Gilardi and Parker, both verbally and in writing, via

27  email and telephone calls.  This included representations that if 224 Entertainment arranged a surety

28  and bridge funding for *Machete*, then 224 Entertainment would receive the following: $502,025 as

1  fixed compensation on a pay-or-play basis; an additional 15% of net proceeds from *Machete* as

2  contingent compensation; 3% of all bridge financing obtained by 224 Entertainment; individual

3  executive producer credits a and company credit; reimbursement for travel, lodging and of out-of-

4  pocket costs; and a CAM agreement for the collection of contingent compensation.   Kaufman,

5  individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, further

6  represented that whether or not Machete's Chop Shop ultimately proceeded with the IBCS Asset-

7  Backed Film Finance Surety Program was not a condition precedent to payment of the money

8  promised to 224 Entertainment, and that 224 Entertainment was not responsible for delivering the

9  funding that was to be the subject of the surety.

10       42.     Subsequently, in or around late July 2009 after Gudas had backed out of the

11  agreement to fund *Machete*, Kaufman, individually and on behalf of Schwartz, Machete's Chop

12  Shop and Overnight Productions, represented to Gilardi and Parker, both verbally and in writing,

13  via email and telephone calls, in Los Angeles and New York, that the Agreement would be honored

14  regardless of whether Gudas financed *Machete* and used the IBCS surety arranged by 224

15  Entertainment.

16       43.     Each of these representations were false, and the Defendants made the representations

17  knowing they were untrue, or recklessly without knowing whether they were true or false.

18       44.     Also in or around late July 2009, Kaufman, individually and on behalf of Schwartz,

19  Machete's Chop Shop and Overnight Productions, requested that Gilardi and Parker immediately

20  raise bridge financing to support production of *Machete* until a new financier was identified.   In

21  making the request for bridge financing, Kaufman, individually and on behalf of Schwartz,

22  Machete's Chop Shop and Overnight Productions, represented to Gilardi and Parker, both verbally

23  and in writing, via email and telephone calls, in Los Angeles and New York, that the Agreement

24  would be honored regardless of whether Gudas financed *Machete* and used the IBCS surety

25  arranged by 224 Entertainment.   On information and belief, Kaufman, individually and on behalf

26  of Schwartz, Machete's Chop Shop and Overnight Productions, made these representations as part

27  of a scheme to facilitate a $2,000,000 bridge loan from Perpetual Media and arranged by 224

28  Entertainment, which was conditioned on the IBCS surety bond being placed in escrow. However,

1  at the time Defendants made these representations, Defendants in fact had no intention of paying

2  224 Entertainment its compensation under the Agreement once the bridge financing was

3  confirmed.

4      45.    Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and

5  Overnight Productions, made the representations to Gilardi and Parker with an intent to defraud 224

6  Entertainment, and for the purpose of inducing 224 Entertainment to rely upon them and on that

7  basis enter into the Agreement and perform the work of obtaining a surety and bridge financing for

8  *Machete*, and to devote considerable time and effort to obtaining a surety and bridge financing for

9  *Machete*.

10     46.    Gilardi and Parker were unaware of the falsity of the above-described representations

11  and, given the professional reputation of Defendants as experienced film-makers and their assurances

12  to Gilardi and Parker that they would compensate 224 Entertainment for its services, Gilardi and

13  Parker, on behalf of 224 Entertainment, with justification acted in reliance upon the truth of the

14  representations by entering into the Agreement, performing the work of obtaining a surety and bridge

15  financing for *Machete*, and in refraining from pursuing or accepting alternative projects.

16     47.    As a direct and proximate result of his reliance upon the truth of the representations,

17  224 Entertainment has suffered and continues to suffer damages in an amount to be proven at trial,

18  but is believed to be in excess of One Million Dollars ($1,000,000). 224 Entertainment will seek

19  leave to amend this Complaint to allege the precise amount when same is ascertained.

20     48.    The aforementioned acts of Defendants, and each of them, were done intentionally

21  or with a conscious disregard of the rights of 224 Entertainment, and with the intent to vex, injure,

22  or annoy 224 Entertainment such as to constitute oppression, fraud, or malice, and that such conduct

23  was authorized, ratified, and adopted by the officers, directors, and/or managing agents of

24  Defendants, and each of them.  Thus, 224 Entertainment is entitled to exemplary and punitive

25  damages in an amount appropriate to punish or set an example of Defendants and to deter such

26  conduct by them and others in the future, according to proof at trial.

27  ///

28  ///

Exhibit  C , Pg. 44

## FOURTH CAUSE OF ACTION

### (For Fraud [Negligent Misrepresentation] Against All Defendants)

49.     Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 28, inclusive, as though fully set forth herein.

50.     224 Entertainment is informed and believes and based thereon alleges that to the extent that the Court determines that Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, did not intentionally make the representations alleged in Paragraphs 41-44, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, negligently and carelessly made the representations to Gilardi and Parker.

51.     224 Entertainment is informed and believes and based thereon alleges that the above representations were made by Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, without any reasonable ground for believing them to be true.

52.     224 Entertainment is informed and believes and based thereon alleges that each of the above representations were made by Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, with an intent to induce 224 Entertainment to rely thereon and did induce 224 Entertainment to enter into the Agreement, perform the work of obtaining a surety and bridge financing for *Machete*, and refrain from pursuing or accepting alternative projects.

53.     At the time or times Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, made these representations, 224 Entertainment was ignorant of the falsity of the representations and reasonably and justifiably believed them to be true.

54.     In reliance upon the representations, 224 Entertainment was induced to do, and did, the acts alleged herein including, but not limited to, entering into the Agreement, performing the work of obtaining a surety and bridge financing for *Machete*, and refraining from pursuing or accepting alternative projects.

55.     224 Entertainment's reliance upon the representations was justified and reasonable.

///

///

Exhibit _C_, Pg. _45_

1   56.   As a direct, proximate and reasonably foreseeable result of the negligent

2   misrepresentations, 224 Entertainment has suffered and continues to suffer damages in an amount

3   to be proven at trial, but is believed to be in excess of One Million Dollars ($1,000,000). 224

4   Entertainment will seek leave to amend this Complaint to allege the precise amount when same is

5   ascertained.

6

7   **WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, jointly

8   and severally, as follows:

9   <u>**AS TO THE FIRST CAUSE OF ACTION:**</u>

10   1.   For an award of general, special, and consequential damages against Defendants in

11   an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

12   the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

13   <u>**AS TO THE SECOND CAUSE OF ACTION:**</u>

14   2.   For an award of general, special, and consequential damages against Defendants in

15   an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

16   the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

17   <u>**AS TO THE THIRD CAUSE OF ACTION:**</u>

18   3.   For an award of general, special, and consequential damages against Defendants in

19   an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

20   the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

21   4.   For punitive damages pursuant to Civil Code § 3294 in an amount appropriate to

22   punish or set an example of Defendants, and to deter such conduct in the future, the exact amount

23   of such damages subject to proof at time of trial;

24   <u>**AS TO THE FOURTH CAUSE OF ACTION:**</u>

25   5.   For an award of general, special, and consequential damages against Defendants in

26   an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at

27   the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

28   ///

Exhibit ___C___, Pg. 46

1  **AS TO ALL CAUSES OF ACTION:**

2      1.    For costs of suit herein;

3      2.    For interest on the above-requested general, special and the maximum legal rate as

4  provided by law; and

5      3.    For such other additional relief as the Court deems just and proper.

6

7  DATED: January 29, 2010        Respectfully submitted,

8                               MARTIN D. SINGER

9                               TODD S. EAGAN
                                LAVELY & SINGER

10                              PROFESSIONAL CORPORATION

11

12                              By: _____
                                        MARTIN D. SINGER

13                            Attorneys for Plaintiff 224 ENTERTAINMENT, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                 Exhibit ___C___, Pg. __47__

## REQUEST FOR JURY TRIAL

Plaintiff 224 Entertainment, LLC hereby requests a trial by jury.

DATED: January 29, 2010

Respectfully submitted,

MARTIN D. SINGER
TODD S. EAGAN
LAVELY & SINGER
PROFESSIONAL CORPORATION

By: _____
        MARTIN D. SINGER
Attorneys for Plaintiff 224 ENTERTAINMENT, LLC

Exhibit C, Pg. 48

4720-2\COMPLAINT 012110

COMPLAINT

Machete's Chop Shop, Inc.
110 Greene Street, Suite 402
New York, NY 10012

As of May 26, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212

Re: "Machete" – Executive Producer

Dear Gentlemen,

This letter shall set forth the material terms of the agreement between 224 Entertainment, LLC ("you" or "your") on the one hand, and Machete's Chop Shop, Inc. ("we", "us" or "our"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "Producer" and collectively, "Producers") in connection with the motion picture currently titled "Machete" (the "Picture"). Subject to our receipt of this Agreement and the Inducement set forth below signed by each Producer, the parties hereby agree as follows:

1.     Condition Precedents. Our obligations hereunder are subject in all respects to satisfaction of the following conditions precedent:

(a)     Your and each Producer's signature and delivery of this Agreement and the Inducement Letter attached hereto, as applicable;

(b)     Full compliance by each Producer with the IRCA requirements of Paragraph 16(e) of the STC;

(c)     The issuance of a completion bond for the Picture, with an irrevocable commitment from the financiers of the Picture to provide the funds sufficient to meet the "strike price" under such completion bond; and

(d)     Should a bridge financier identified by you or Producers not enter into an agreement with us to provide us with $150,000 or more in bridge financing then the condition precedent of our receipt of the fully executed agreement between Tax Credit Finance, LLC or any other applicable financier ("Loan Provider"), and Edmund C. Scarborough ("Scarborough") and/or The IBCS Group, Inc. (the "Surety") (hereafter Scarborough and Surety collectively and severely referred to as "IBCS") relating to Scarborough's guaranty and Surety's surety bond covering repayment of Loan Provider's principal amount of financing, being utilized by us for the purpose of producing the Picture (the "Surety Bond Agreement") shall apply. However, to the extent that a bridge financier identified by you or Producers does enter into an agreement with us to provide us with $150,000 or more in bridge financing then absolutely no condition precedent relating to any of Loan Provider, IBCS, Scarborough or the Surety Bond Agreement shall apply to this agreement. For the removal of all doubt the parties agree that bridge loan financier candidates identified by Producers include but are not limited to Michael Prozer, Elisa Salinas, Burt Ward and Gareth West.

2.     Services. We hereby engage you to furnish us, and you hereby agree to furnish us the non-exclusive services of each Producer as an executive producer for the Picture, commencing on the date hereof and ending upon the completion of principal photography for the Picture. Producers shall render those services customarily rendered by executive producers in the motion picture industry.

3.     Compensation.

$EX$ $A$

(a)     Fixed Compensation. Provided neither you nor Producers are in material breach or uncured default hereunder, we agree to pay and you agree to accept as full and complete consideration

Exhibit_____C_____, Pg. 49

for your and Producer's services hereunder and for all rights transferred by you and Producers to us hereunder, Five Hundred Two Thousand and Twenty-Five Dollars ($502,025) (the "Fixed Compensation"), which shall be payable no later than the commencement of principal photography for the Picture (unless otherwise required by the bond company for the Picture), provided that in no event shall the Fixed Compensation be payable to you on a schedule less favorable than the payment schedule for the fixed compensation payable to any other executive producer for the Picture. The Fixed Compensation shall be pay or play upon satisfaction of the conditions precedent. It is further understood between the parties that the Fixed Compensation set forth in this paragraph shall be increased by an amount equal to three percent (3%) of one hundred percent (100%) of the aggregate bridge loan financing contracted between us and any of the bridge financiers identified by you or Producers (for example should a bridge financing party identified by you or Producers contract with us for a $500,000 bridge loan then the Fixed Compensation due to you shall increase by the amount of $15,000 to $517,025).

(b)     Contingent Compensation. Provided neither you nor Producers are in material breach or default hereunder, we agree to pay you Fifteen Percent (15%) of one hundred percent (100%) of "Company's Net Proceeds," ("Contingent Compensation") which shall be defined, calculated and accounted for on a favored nations basis with all other recipients of Company's Net Proceeds, if any.

(c)     Collection Account. We acknowledge that prior to the completion of principal photography of the Picture, you and we will enter into a collection account management agreement (the "CAM") with a collection agent (the "Collection Agent") and the Collection Agent will directly account to you for your Contingent Compensation hereunder. Furthermore, you and Producers shall be permitted to be a party to the CAM and receive direct audit and accounting rights, provided that (i) you and Producers negotiate the CAM expeditiously in good faith; and (ii) in the event of a dispute amongst the parties, we shall have final approval over the terms of the CAM.

(d)     Independent Contractor. You and Producers hereby acknowledge and agree that your services are being provided hereunder as an independent contractor, and accordingly, and pursuant to your request, we shall not withhold, report or pay so-called withholding taxes with respect to the compensation payable hereunder. So-called "withholding taxes" shall include, without limitation, federal and state income taxes, federal social security tax, and New York unemployment insurance tax, if applicable. Should we be subjected to any expense or liability by reason of such failure to withhold, report or pay such taxes (including, but not limited to, penalties, interest or attorney's fees), you and Producers agree that you and Producers will indemnify and hold us harmless therefrom. Accordingly, you and Producers shall, upon our demand, promptly reimburse us for all such expenses.

4.     Credit. Provided neither you nor Producers are in material breach or uncured default hereunder and we produce the Picture, we shall accord you the following credits in connection with the Picture:

(a)     Individual Credits. We shall accord each Producer an individual executive producer credits (a) in the main titles (whether such main titles appear at the beginning or end of the Picture), on all copies of the Picture, on a separate card shared only with each other in the order of Gilardi then Parker, in a size equal to or greater than the on screen credit accorded to any other individual executive producer for the Picture; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, container and/or jackets thereof in which any other individual is accorded credit; (iii) in the billing block of any paid advertisements for the Picture, wherever any other individual receives credit therein, in a size equal to or greater than the size of any other executive producer credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other executive producer receives credit therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the size of any other executive producer credit appearing therein, in first and second position among all executive producers.

(b)     Production Company Credit. You shall receive an "in association with" production company credit (i) on all copies of the Picture, on a shared card with other "in association with" credits, if any, otherwise on a separate card, in the main titles; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, containers and/or jackets thereof in which any other production company credit or "in association with" credit appears; (iii) in the billing block of all paid advertisements for the Picture, wherever any other "in associate with" credit appears, in a size equal to or greater than the size of any other "in association with" credit or production company credit appearing

Exhibit ___C___ , Pg. 50

therein; and (iv) in the billing block of any excluded advertisements wherever any other "in association with" credit or production company credit appears therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the "in association with" credit or production company credit accorded to any other production company therein.

(c)     General: As used herein, "size" shall mean height, width, thickness and duration where applicable; and references to the "main titles" are to the series of credits, whether before or after the body of the Picture, where the "directed by" (as opposed to the "film by") credit appears. All paid advertising credits shall be subject to the limitations set forth herein and to each distributor's customary exclusions and exceptions, and shall not be applicable with respect to award, nomination or congratulatory ads mentioning only the specific honorees or recipients and ads announcing a personal appearance. All other characteristics of and matters with respect to credits shall be within our sole discretion. No casual or inadvertent failure by us or any distributor of the Picture to comply with the provisions of this Paragraph 4 shall constitute a breach of this Agreement. In the event of any failure by us to comply with the foregoing credit provisions, and upon written notice from you thereof, we shall use meaningful efforts to prospectively cure any such failure which is economically practicable to cure. We shall contractually oblige our North American distributor of the Picture to comply with the foregoing credit obligations and use reasonable efforts to contractually obligate all other remaining licensees to comply with the foregoing credit obligations.

5.     Travel/Accommodations/Expenses: Provided that neither you or Producers are in uncured material breach of this Agreement, we agree to furnish each Producer with the following production perquisites during the principal photography of the Picture, on an if used basis: (a) one (1) first class (or best available) round-trip air transportation between each of Producer's primary city of residence and Austin, Texas; (b) reasonable individual accommodations in Austin Texas; (c) ground transportation; (d) a reasonable per diem; (e) a rental car if provided to other producers; (f) a non-exclusive office, which may be shared with each other and other producers; and (g) trailer facilities, which may be shared with each other and other producers. In the event any other producer is provided with more favorable production perquisites than the perquisites set forth in this Paragraph 5 (other than with regard to number of trips to Austin, Texas), then Producers shall receive the benefit of such more favorable perquisites.

6.     Approvals: Provided you and Producers are not in uncured material default hereunder, you shall have a right to approve of any foreign market sales of the Picture which are less than the estimated "take" prices issued by the sales agent until such time, if ever, that the sales for the Picture are sufficient to recoup any monies due to Loan Provider relating to the Surety Bond Agreement, if applicable, it being understood that: (a) there are several other production lenders loaning money in connection with the Picture (collectively the "Senior Lenders"); (b) Senior Lenders have first priority security interests ahead of Loan Provider; (c) Senior Lenders have a right to approve the foregoing sales of the Picture; and (d) until such time as Senior Lenders have been full and indefeasibly repaid, you hereby waive your right of approval as set forth herein. We shall meaningfully consult with you on all other distribution and business elements (e.g. budget, pre-production/production/post-production schedules, ad campaigns and release pattern, distributors, sales agents and distribution agreements) in connection with the Picture; provided that in the event of a disagreement following good faith conversations, our decision shall control.

7.     Rights. You hereby agree that all of the results and proceeds of your and Producers services hereunder, including without limitation any materials created by you and/or Producers in connection with the Picture (collectively the "Work") shall be prepared within the scope of your and Producer's employment by us and shall be a "work made for hire" for us as specially commissioned for use as a part of a motion picture in accordance with the U.S. Copyright Act. You and Producers shall execute the Certificate of Results and Proceeds attached hereto as Exhibits "A" and "B" simultaneously with the execution of this Agreement.

8.     Insurance and Indemnity. We shall add you and Producers as additional insureds on our Errors and Omissions Insurance and general liability insurance policies with respect to the Picture, subject to the limitations, restrictions and terms of said policies.

9.     Premieres. Each of Producers (and a non-business related companion each) shall be invited to attend each United States "celebrity" premiere, if any, of the Picture, any previews or any screenings of the Picture as well as any "A" list film festivals (i.e., Toronto, Sundance, Berlin, Cannes and Venice) in which

the Picture is screened in competition, on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture. We shall use reasonable efforts to cause the domestic distributor of the Picture to provide Producers' and their non-business related companions with reasonable transportation, accommodations and expenses for Producers only in connection with such premiere and any applicable film festivals on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture; it being understood that no failure by the domestic distributor to provide such transportation, accommodations and per diems shall be a breach of this Agreement.

10.     DVD.   Each of Producers shall be provided with a DVD copy (plus Blu-Ray if available) and a one-sheet of the Picture at no charge to you or Producers, if and when such DVD copies and one-sheets become commercially available, for you and Producers' own personal, non-commercial use.

11.     Warranties and Indemnities.

        (a)     You and Producers represent that the results and proceeds of your services: (A) are and will be original with you, as applicable, will not be copied in whole or in part from any other work (except such materials as may have been furnished to you by us or that which is in the public domain); (B) that the use of the results and proceeds of your and Producers services by us, or our successors, licensees and assigns in connection with the Picture or in any other way will not infringe upon or violate any copyright; and (C) to the best of your and Producers' knowledge, shall not constitute defamation of, or infringe upon or violate the right of privacy of any common law rights or trademark rights or other rights of any party. In addition, you and Producers represent that neither you nor Producers have made any promises or any commitments to any third party relating to the Picture or the material upon which it is based.

        (b)     You and Producers shall indemnify and hold harmless us, our parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs, in connection with any third party claim or action arising out of the breach of any of your representations, warranties, agreements, undertakings or certifications herein. Solely with respect to non-copyright related and non-trademark related claims, the representation stated in this Paragraph 11(b) is made to the best of your and Producers knowledge, including that which you and Producers should have known in the exercise of reasonable prudence.

        (c)     We shall indemnify and hold you and Producers harmless against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs incurred by you and Producers and your and Producers' respective parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives as a result of any third party claim or action (other than those arising out of (i) a breach of your and Producers representations, warranties, agreements, undertakings or certifications hereunder, and/or (ii) any criminal act, gross negligence, or willful or reckless misconduct of you and/or Producers; and/or (iii) any breach of any contract by you and/or Producers) arising from our breach of any representation, warranty, undertaking, agreement or certification by us hereunder or our development, production, distribution or exploitation of the Picture (including the exploitation of ancillary rights therein).

12.     Miscellaneous.

        (a)     Publicity.   Neither you nor Producers shall participate directly or indirectly in the dissemination of information concerning us (or any of our officers or employees) or the Picture to individuals or media entities without our prior written consent, other than customary, incidental non-derogatory personal references relating to your employment hereunder, provided that, you and Producers may issue personal publicity relating to you and Producers that incidentally makes non-derogatory reference to us and the Picture and your and Producers engagement in connection therewith. We will exercise reasonable good faith efforts to ensure that: (i) your name and Producers' names are included in the initial press announcements relating to the Picture and in subsequent press announcements issued directly by us or our publicists; and (ii) your name and company biography and Producers' names and individual biographies, as provided to us by you and Producers, are included in both the international and

Exhibit _C_   52

domestic press kits created and issued relating to the Picture; it being understood that no failure by us to comply with the provisions of this Paragraph 12(a) shall be a breach of this Agreement.

(b)　　Remedies. You and Producers acknowledge that in the event of any breach hereunder, you and Producers will be limited to a remedy at law for damages, if any, and neither you nor Producers shall have the right and hereby expressly waive any right you may have to terminate or rescind this Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein.

(c)　　Remedies Cumulative. Except as may be expressly provided to the contrary herein. The parties' various rights and remedies hereunder shall be cumulative and the exercise or enforcement of any one or more of them shall not preclude the enforcing party from exercising or enforcing any of the others or any other right or remedy provided for by law.

(d)　　Binding Effect. This agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

(e)　　Counterparts. This agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this agreement.

(f)　　Assignment. You and Producers agree that our rights with respect to the Work and/or your services may be freely assigned and licensed and in the event of such assignment or license, this Agreement shall remain binding upon you and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing our executory obligations with respect to the rights assigned, such assignment shall constitute a novation and we shall have no further obligations or liabilities hereunder.   In the event of any other assignment by us, we shall remain secondarily liable to you hereunder.

(g)　　Notices. Notices hereunder shall be in writing. Any notices and payments hereunder shall be given by personal delivery via reputable overnight courier, by pre-paid mailing or facsimile transmission (with a confirmation copy sent by regular mail). Unless otherwise specified herein, (i) the date of personal delivery or facsimile of such notice or payment, (ii) one (1) business day after deposit with an overnight courier of such notice or payment, or (iii) three (3) business days after the deposit by mail, shall be deemed the date of service of such notice or payment. The names and addresses below concerning notice to all parties hereto shall also be deemed to be the place where payments required under this agreement shall be sent:

| | |
|---|---|
| To us: | Machete's Chop Shop, Inc.<br>15 Mercer Street, Suite 4<br>New York, NY 10013<br>Attn: Aaron Kaufman<br>Fax: (212) 625-0533 |
| With a courtesy copy to: | Schreck Rose Dapello Adams & Hurwitz LLP<br>1790 Broadway - 20th Floor<br>New York, New York 10019<br>Attn: Andrew P. Hurwitz, Esq. &<br>　　　Alan D. Sacks, Esq.<br>Fax: (212) 832-2969 |
| To you: | 224 Entertainment, LLC<br>C/o ICM<br>10250 Constellation Blvd.<br>Los Angeles, CA 90067 |

Attn: Jack Gilardi, Sr.
Fax: (310) 248-4613

With a courtesy (facsimile only) copy to:　　　1025 Riverland Woods Place, Ste, 521
Charleston, SC 29412
Attn: Darby Parker
Fax: (323) 446-7666

(h)　　Subsequent Productions.　In the event that we (or our licensee, designee, assignee, affiliate (including, without limitation, Weekend (defined below) or Overnight (defined below) or successor-in-interest with respect to the Picture) acquire any derivative and/or subsequent production rights based on the Picture and initiate any such derivative and/or subsequent production (and provided that (i) neither you, Gilardi nor Parker are in material breach or uncured default hereunder or (ii) Gilardi and Parker are not then executives of so-called "major," mini-major" or "major independent" motion picture production and/or distribution and/or exhibition companies), you, Gilardi and Parker shall have the right of first negotiation, for a period of 30 business days from the date of your receipt of notice by us, to be engaged as executive producers on the first of any and all such derivative and/or subsequent productions, in any and all media (provided that if such derivative and/or subsequent production is intended for a network television series, your, Gilardi's and Parker's engagements would be subject to network approval), which rights shall be on a rolling basis, and, if such derivative and/or subsequent production has a budget anticipated to be equal to or greater than the budget of the Picture, on all financial terms and conditions which are no less favorable than those set forth in this Agreement, but in any case the fixed compensation, contingent compensation and contingent deferment, respectively, payable to you for such derivative and/or subsequent production shall be equal to no less than the relative proportional amount as your fixed compensation, contingent compensation and contingent deferment, if any, on the Picture bears to the fixed compensation, contingent compensation and contingent deferment, if any, respectively, paid to, in the aggregate, Overnight Productions, LLC ("Overnight"), Weekend, LLC ("Weekend"), Aaron Kaufman ("Kaufman"), and Rick Schwartz ("Schwartz," collectively, the "Owner Parties") (and/or Kaufman's, Schwartz's, Weekend's and Overnight's respective loan out company or companies, trusts, respective parents, affiliates, subsidiaries or successors), for services rendered in connection with the Picture.　In addition, your fixed compensation will be paid on a no less favorable schedule than set forth herein, and your contingent compensation and contingent deferment will be defined, calculated and paid on the same basis as the Owner Parties' contingent compensation and contingent deferment, respectively.

(i)　　Further Instruments/Choice of Law.　The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this agreement.　This agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

[SIGNATURES ON THE NEXT PAGE]

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this Agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By: _____
An Authorized Signatory

Accepted and Agreed

224 ENTERTAINMENT, LLC

By: _____
An Authorized Signatory

224 Entertainment – Executive Producer Agreement

Page 7 of 12

Exhibit ___C___, Pg. _65_

I, Jack Gilardi, Jr. have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____Jack Gilardi, Jr._____

Signature:_____[signature]_____

I, Darby Parker have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender"), in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____Darby Parker_____

Signature:_____[signature]_____

Exhibit A

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
### (the "Certificate")

PICTURE:         "Machete" (the "Picture")

LENDER:          224 Entertainment, LLC ("Lender")

PRODUCER:        Jack Gilardi, Jr.

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of May 26, 2009 (the "Agreement"):

(i)      For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any·rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(ii)     Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement.  If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)    Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)     Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)     Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder. In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of ____07/29/09____.

                          224 Entertainment, LLC ("Lender")

                          By:_____

                          Its:____Jack Gilardi, Jr., Member_____


                          _____
                          Jack Gilardi, Jr. ("Producer")

## Exhibit B

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
(the "Certificate")

| | |
|---|---|
| **PICTURE:** | "Machete" (the "Picture") |
| **LENDER:** | 224 Entertainment, LLC ("Lender") |
| **PRODUCER:** | Darby Parker |

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of May 26, 2009 (the "Agreement"):

(i) For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(iii) Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company. Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement. If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest. If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii) Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld). The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv) Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)   Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network  (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder. In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of ___07/29/09___ .

224 Entertainment, LLC ("Lender")

By:_____

Its:____Darby Parker, Member_____

_____
Darby Parker ("Producer")

Machete's Chop Shop, Inc.
110 Greene Street, Suite 402
New York, NY 10012

As of July 28, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212

     Re:    "Machete" – Executive Producer

Dear Gentlemen,

This letter shall set forth the material terms of the agreement between 224 Entertainment, LLC ("**you**" or "**your**") on the one hand, and Machete's Chop Shop, Inc. ("**we**", "**us**" or "**our**"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "**Producer**" and collectively, "**Producers**") in connection with the motion picture currently titled "Machete" (the "**Picture**"). Subject to our receipt of this Agreement and the Inducement set forth below signed by each Producer, the parties hereby agree as follows:

1.     <u>Condition Precedents</u>. Our obligations hereunder are subject in all respects to satisfaction of the following conditions precedent:

    (a)    Your and each Producer's signature and delivery of this Agreement and the Inducement Letter attached hereto, as applicable;

    (b)    Full compliance by each Producer with the IRCA requirements of Paragraph 16(e) of the STC;

    (c)    The issuance of a completion bond for the Picture, with an irrevocable commitment from the financiers of the Picture to provide the funds sufficient to meet the "strike price" under such completion bond; and

    (d)    Should a bridge financier identified by you or Producers not enter into an agreement with us to provide us with $150,000 or more in bridge financing then the condition precedent of our receipt of the fully executed agreement between Tax Credit Finance, LLC or any other applicable financier ("Loan Provider"), and Edmund C. Scarborough ("Scarborough") and/or The IBCS Group, Inc. (the "Surety") (hereafter Scarborough and Surety collectively and severely referred to as "IBCS") relating to Scarborough's guaranty and Surety's surety bond covering repayment of Loan Provider's principal amount of financing, being utilized by us for the purpose of producing the Picture (the "Surety Bond Agreement") shall apply. However, to the extent that a bridge financier identified by you or Producers does enter into an agreement with us to provide us with $150,000 or more in bridge financing then absolutely no condition precedent relating to any of Loan Provider, IBCS, Scarborough or the Surety Bond Agreement shall apply to this agreement. For the removal of all doubt the parties agree that bridge loan financier candidates identified by Producers include but are not limited to Michael Prozer, Elisa Salinas, Burt Ward and Gareth West.

2.     <u>Services</u>. We hereby engage you to furnish us, and you hereby agree to furnish us the non-exclusive services of each Producer as an executive producer for the Picture, commencing on the date hereof and ending upon the completion of principal photography for the Picture. Producers shall render those services customarily rendered by executive producers in the motion picture industry.

3.     <u>Compensation</u>.

    (a)    <u>Fixed Compensation</u>. Provided neither you nor Producers are in material breach or uncured default hereunder, we agree to pay and you agree to accept as full and complete consideration

FKKS: 379014.v2                                              18749.300

Exhibit _C_, Pg. 61

for your and Producer's services hereunder and for all rights transferred by you and Producers to us hereunder, Five Hundred Two Thousand and Twenty-Five Dollars ($502,025) (the "**Fixed Compensation**"), which shall be payable no later than the commencement of principal photography for the Picture (unless otherwise required by the bond company for the Picture), provided that in no event shall the Fixed Compensation be payable to you on a schedule less favorable than the payment schedule for the fixed compensation payable to any other executive producer for the Picture. The Fixed Compensation shall be pay or play upon satisfaction of the conditions precedent.

(b)    Contingent Compensation.  Provided neither you nor Producers are in material breach or default hereunder, we agree to pay you Fifteen Percent (15%) of one hundred percent (100%) of "Company's Net Proceeds," ("Contingent Compensation") which shall be defined, calculated and accounted for on a favored nations basis with all other recipients of Company's Net Proceeds, if any.

(c)    Collection Account.   We acknowledge that prior to the completion of principal photography of the Picture, you and we will enter into a collection account management agreement (the "CAM") with a collection agent (the "Collection Agent") and the Collection Agent will directly account to you for your Contingent Compensation hereunder. Furthermore, you and Producers shall be permitted to be a party to the CAM and receive direct audit and accounting rights, provided that (i) you and Producers negotiate the CAM expeditiously in good faith; and (ii) in the event of a dispute amongst the parties, we shall have final approval over the terms of the CAM.

(d)    Independent Contractor.  You and Producers hereby acknowledge and agree that your services are being provided hereunder as an independent contractor, and accordingly, and pursuant to your request, we shall not withhold, report or pay so-called withholding taxes with respect to the compensation payable hereunder. So-called "withholding taxes" shall include, without limitation, federal and state income taxes, federal social security tax, and New York unemployment insurance tax, if applicable. Should we be subjected to any expense or liability by reason of such failure to withhold, report or pay such taxes (including, but not limited to, penalties, interest or attorney's fees), you and Producers agree that you and Producers will indemnify and hold us harmless therefrom. Accordingly, you and Producers shall, upon our demand, promptly reimburse us for all such expenses.

4.    Credit.  Provided neither you nor Producers are in material breach or uncured default hereunder and we produce the Picture, we shall accord you the following credits in connection with the Picture:

(a)    Individual Credits.  We shall accord each Producer an individual executive producer credits (a) in the main titles (whether such main titles appear at the beginning or end of the Picture), on all copies of the Picture, on a separate card shared only with each other in the order of Gilardi then Parker, in a size equal to or greater than the on screen credit accorded to any other individual executive producer for the Picture; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, container and/or jackets thereof in which any other individual is accorded credit; (iii) in the billing block of any paid advertisements for the Picture, wherever any other individual receives credit therein, in a size equal to or greater than the size of any other executive producer credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other executive producer receives credit therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the size of any other executive producer credit appearing therein, in first and second position among all executive producers.

(b)    Production Company Credit.  You shall receive an "in association with" production company credit (i) on all copies of the Picture, on a shared card with other "in association with" credits, if any, otherwise on a separate card, in the main titles; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, containers and/or jackets thereof in which any other production company credit or "in association with" credit appears; (iii) in the billing block of all paid advertisements for the Picture, wherever any other "in associate with" credit appears, in a size equal to or greater than the size of any other "in association with" credit or production company credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other "in association with" credit or production company credit appears therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the "in association with" credit or production company credit accorded to any other production company therein.

Exhibit____C____, Pg.__62__

(c)     General:  As used herein, "size" shall mean height, width, thickness and duration where applicable; and references to the "main titles" are to the series of credits, whether before or after the body of the Picture, where the "directed by" (as opposed to the "film by") credit appears.  All paid advertising credits shall be subject to the limitations set forth herein and to each distributor's customary exclusions and exceptions, and shall not be applicable with respect to award, nomination or congratulatory ads mentioning only the specific honorees or recipients and ads announcing a personal appearance.  All other characteristics of and matters with respect to credits shall be within our sole discretion. No casual or inadvertent failure by us or any distributor of the Picture to comply with the provisions of this Paragraph 4 shall constitute a breach of this Agreement. In the event of any failure by us to comply with the foregoing credit provisions, and upon written notice from you thereof, we shall use meaningful efforts to prospectively cure any such failure which is economically practicable to cure. We shall contractually oblige our North American distributor of the Picture to comply with the foregoing credit obligations and use reasonable efforts to contractually obligate all other remaining licensees to comply with the foregoing credit obligations.

5.      Travel/Accommodations/Expenses:  Provided that neither you or Producers are in uncured material breach of this Agreement, we agree to furnish each Producer with the following production perquisites during the principal photography of the Picture, on an if used basis:  (a) one (1) first class (or best available) round-trip air transportation between each of Producer's primary city of residence and Austin, Texas; (b) reasonable individual accommodations in Austin Texas; (c) ground transportation; (d) a reasonable per diem; (e) a rental car if provided to other producers; (f) a non-exclusive office, which may be shared with each other and other producers; and (g) trailer facilities, which may be shared with each other and other producers. In the event any other producer is provided with more favorable production perquisites than the perquisites set forth in this Paragraph 5 (other than with regard to number of trips to Austin, Texas), then Producers shall receive the benefit of such more favorable perquisites.

6.      Approvals:  Provided you and Producers are not in uncured material default hereunder, you shall have a right to approve of any foreign market sales of the Picture which are less than the estimated "take" prices issued by the sales agent until such time, if ever, that the sales for the Picture are sufficient to recoup any monies due to Loan Provider relating to the Surety Bond Agreement, if applicable, it being understood that: (a) there are several other production lenders loaning money in connection with the Picture (collectively the "Senior Lenders"); (b) Senior Lenders have first priority security interests ahead of Loan Provider; (c) Senior Lenders have a right to approve the foregoing sales of the Picture; and (d) until such time as Senior Lenders have been fully and indefeasibly repaid, you hereby waive your right of approval as set forth herein. We shall meaningfully consult with you on all other distribution and business elements (e.g. budget, pre-production/production/post-production schedules, ad campaigns and release pattern, distributors, sales agents and distribution agreements) in connection with the Picture; provided that in the event of a disagreement following good faith conversations, our decision shall control.

7.      Rights.  You hereby agree that all of the results and proceeds of your and Producers services hereunder, including without limitation any materials created by you and/or Producers in connection with the Picture (collectively the "**Work**") shall be prepared within the scope of your and Producer's employment by us and shall be a "work made for hire" for us as specially commissioned for use as a part of a motion picture in accordance with the U.S. Copyright Act.  You and Producers shall execute the Certificate of Results and Proceeds attached hereto as Exhibits "A" and "B" simultaneously with the execution of this Agreement.

8.      Insurance and Indemnity.  We shall add you and Producers as additional insureds on our Errors and Omissions Insurance and general liability insurance policies with respect to the Picture, subject to the limitations, restrictions and terms of said policies.

9.      Premieres.  Each of Producers (and a non-business related companion each) shall be invited to attend each United States "celebrity" premiere, if any, of the Picture, any previews or any screenings of the Picture as well as any "A" list film festivals (i.e., Toronto, Sundance, Berlin, Cannes and Venice) in which the Picture is screened in competition, on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any individual producer rendering services on the Picture. We shall use reasonable efforts to cause the domestic distributor of the Picture to provide Producers' and their non-business related companions with reasonable transportation, accommodations and expenses for Producers only in connection with such premiere and any

applicable film festivals on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture; it being understood that no failure by the domestic distributor to provide such transportation, accommodations and per diems shall be a breach of this Agreement.

10.     DVD.  Each of Producers shall be provided with a DVD copy (plus Blu-Ray if available) and a one-sheet of the Picture at no charge to you or Producers, if and when such DVD copies and one-sheets become commercially available, for you and Producers' own personal, non-commercial use.

11.     Warranties and Indemnities.

        (a)     You and Producers represent that the results and proceeds of your services: (A) are and will be original with you, as applicable, will not be copied in whole or in part from any other work (except such materials as may have been furnished to you by us or that which is in the public domain); (B) that the use of the results and proceeds of your and Producers services by us, or our successors, licensees and assigns in connection with the Picture or in any other way will not infringe upon or violate any copyright; and (C) to the best of your and Producers' knowledge, shall not constitute defamation of, or infringe upon or violate the right of privacy of any common law rights or trademark rights or other rights of any party. In addition, you and Producers represent that neither you nor Producers have made any promises or any commitments to any third party relating to the Picture or the material upon which it is based.

        (b)     You and Producers shall indemnify and hold harmless us, our parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs, in connection with any third party claim or action arising out of the breach of any of your representations, warranties, agreements, undertakings or certifications herein. Solely with respect to non-copyright related and non-trademark related claims, the representation stated in this Paragraph 11(b) is made to the best of your and Producers knowledge, including that which you and Producers should have known in the exercise of reasonable prudence.

        (c)     We shall indemnify and hold you and Producers harmless against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs incurred by you and Producers and your and Producers' respective parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives as a result of any third party claim or action (other than those arising out of (i) a breach of your and Producers representations, warranties, agreements, undertakings or certifications hereunder, and/or (ii) any criminal act, gross negligence, or willful or reckless misconduct of you and/or Producers; and/or (iii) any breach of any contract by you and/or Producers) arising from our breach of any representation, warranty, undertaking, agreement or certification by us hereunder or our development, production, distribution or exploitation of the Picture (including the exploitation of ancillary rights therein).

12.     Miscellaneous.

        (a)     Publicity.  Neither you nor Producers shall participate directly or indirectly in the dissemination of information concerning us (or any of our officers or employees) or the Picture to individuals or media entities without our prior written consent, other than customary, incidental non-derogatory personal references relating to your employment hereunder, provided that, you and Producers may issue reasonable personal publicity relating to you and Producers that incidentally makes non-derogatory reference to us and the Picture and your and Producers engagement in connection therewith. We will exercise reasonable good faith efforts to ensure that: (i) your name and Producers' names are included in the initial press announcements relating to the Picture and in subsequent press announcements issued directly by us or our publicists; and (ii) your name and company biography and Producers' names and individual biographies, as provided to us by you and Producers, are included in both the international and domestic press kits created and issued relating to the Picture; it being understood that no failure by us to comply with the provisions of this Paragraph 12(a) shall be a breach of this Agreement.

        (b)     Remedies.  You and Producers acknowledge that in the event of any breach hereunder, you and Producers will be limited to a remedy at law for damages, if any, and neither you nor Producers shall have the right and hereby expressly waive any right you may have to terminate or rescind this

Exhibit____C____, Pg.__64__

Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein.

(c)     Remedies Cumulative.  Except as may be expressly provided to the contrary herein. The parties' various rights and remedies hereunder shall be cumulative and the exercise or enforcement of any one or more of them shall not preclude the enforcing party from exercising or enforcing any of the others or any other right or remedy provided for by law.

(d)     Binding Effect.  This agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

(e)     Counterparts.  This agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this agreement.

(f)     Assignment.  You and Producers agree that our rights with respect to the Work and/or your services may be freely assigned and licensed and in the event of such assignment or license, this Agreement shall remain binding upon you and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing our executory obligations with respect to the rights assigned, such assignment shall constitute a novation and we shall have no further obligations or liabilities hereunder.  In the event of any other assignment by us, we shall remain secondarily liable to you hereunder.

(g)     Notices. Notices hereunder shall be in writing. Any notices and payments hereunder shall be given by personal delivery via reputable overnight courier, by pre-paid mailing or facsimile transmission (with a confirmation copy sent by regular mail). Unless otherwise specified herein, (i) the date of personal delivery or facsimile of such notice or payment, (ii) one (1) business day after deposit with an overnight courier of such notice or payment, or (iii) three (3) business days after the deposit by mail, shall be deemed the date of service of such notice or payment. The names and addresses below concerning notice to all parties hereto shall also be deemed to be the place where payments required under this agreement shall be sent:

To us:                                       Machete's Chop Shop, Inc.
                                             15 Mercer Street, Suite 4
                                             New York, NY 10013
                                             Attn: Aaron Kaufman
                                             Fax: (212) 625-0533

With a courtesy copy to:                     Schreck Rose Dapello Adams & Hurwitz LLP
                                             1790 Broadway - 20th Floor
                                             New York, New York 10019
                                             Attn: Andrew P. Hurwitz, Esq. &
                                                 Alan D. Sacks, Esq.
                                             Fax: (212) 832-2969

To you:                                      224 Entertainment, LLC
                                             C/o ICM
                                             10250 Constellation Blvd.
                                             Los Angeles, CA 90067
                                             Attn: Jack Gilardi, Sr.
                                             Fax: (310) 248-4613

With a courtesy (facsimile only) copy to:    1025 Riverland Woods Place, Ste, 521
                                             Charleston, SC 29412
                                             Attn: Darby Parker

Fax: (323) 446-7666

(h)     Subsequent Productions.  In the event that we (or our licensee, designee, assignee, affiliate (including, without limitation, Weekend (defined below) or Overnight (defined below) or successor-in-interest with respect to the Picture) acquire any derivative and/or subsequent production rights based on the Picture and initiate any such derivative and/or subsequent production (and provided that (i) neither you, Gilardi nor Parker are in material breach or uncured default hereunder or (ii) Gilardi and Parker are not then executives of so-called "major," mini-major" or "major independent" motion picture production and/or distribution and/or exhibition companies), you, Gilardi and Parker shall have the right of first negotiation, for a period of 30 business days from the date of your receipt of notice by us, to be engaged as executive producers on the first of any and all such derivative and/or subsequent productions, in any and all media (provided that if such derivative and/or subsequent production is intended for a network television series, your, Gilardi's and Parker's engagements would be subject to network approval), which rights shall be on a rolling basis, and, if such derivative and/or subsequent production has a budget anticipated to be equal to or greater than the budget of the Picture, on all financial terms and conditions which are no less favorable than those set forth in this Agreement, but in any case the fixed compensation, contingent compensation and contingent deferment, respectively, payable to you for such derivative and/or subsequent production shall be equal to no less than the relative proportional amount as your fixed compensation, contingent compensation and contingent deferment, if any, on the Picture bears to the fixed compensation, contingent compensation and contingent deferment, if any, respectively, paid to, in the aggregate, Overnight Productions, LLC ("Overnight"), Weekend, LLC ("Weekend"), Aaron Kaufman ("Kaufman"), and Rick Schwartz ("Schwartz," collectively, the "Owner Parties") (and/or Kaufman's, Schwartz's, Weekend's and Overnight's respective loan out company or companies, trusts, respective parents, affiliates, subsidiaries or successors), for services rendered in connection with the Picture. In addition, your fixed compensation will be paid on a no less favorable schedule than set forth herein, and your contingent compensation and contingent deferment will be defined, calculated and paid on the same basis as the Owner Parties' contingent compensation and contingent deferment, respectively.

(i)     Further Instruments/Choice of Law.  The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this agreement.  This agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this Agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By:_____
          An Authorized Signatory

Accepted and Agreed

2224 ENTERTAINMENT, LLC

By: _____
      An Authorized Signatory

FKKS: 379014.v2

18749.300

Exhibit  _C_ , Pg. 66

I, Jack Gilardi, Jr. have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____ JACK GILARDI, JR._____

Signature:_____ (signature) _____

I, Darby Parker have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____ DARBY PARKER _____

Signature:_____ (signature) _____

Exhibit A

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
(the "Certificate")

    PICTURE:         "Machete" (the "Picture")

    LENDER:         224 Entertainment, LLC ("Lender")

    PRODUCER:    Jack Gilardi, Jr.

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of July 28, 2009 (the "Agreement"):

(i)     For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(ii)    Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company. Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement. If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest. If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)   Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld). The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)   Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

Exhibit _C_, Pg. _68_

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)     Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder. In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of ___08/04/09___.

224 Entertainment, LLC ("Lender")

By: _____

Its: ___JACK GILARDI, JR., Member___

_____

Jack Gilardi, Jr. ("Producer")

FKKS: 379014.v2

Exhibit B

**CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS**
**(the "Certificate")**

PICTURE:         "Machete" (the "Picture")

LENDER:          224 Entertainment, LLC ("Lender")

PRODUCER:        Darby Parker

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of July 28, 2009 (the "Agreement"):

(i)     For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(iii)   Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and/or deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement. If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)   Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)    Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

Exhibit ___C___, Pg. _70_

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v) Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder. In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of 08/04/09 .

224 Entertainment, LLC ("Lender")

By: _____

Its: DARBY PARKER, Member

_____

Darby Parker ("Producer")

Exhibit C , Pg. 71

**Machete's Chop Shop, Inc.**
15 Mercer Street, Suite 4
New York, NY 10013

As of July 28, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212
Attn: Darby Parker & Jack Gilardi, Jr.

      Re:    "Machete"

Dear Gentlemen,

      Reference is herein made to that certain agreement (the "**EP Agreement**") between 224 Entertainment, LLC ("**you**" or "**your**") on the one hand, and Machete's Chop Shop, Inc. ("**we**", "**us**" or "**our**"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "**Producer**" and collectively, "**Producers**") in connection with the motion picture currently titled "Machete" (the "**Picture**").

      For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

      (a)      The Fixed Compensation (as such term is defined in the EP Agreement) set forth in Paragraph 3(a) of the EP Agreement shall be increased by an amount equal to three percent (3%) of one hundred percent (100%) of the aggregate bridge loan financing contracted between us and any of the bridge financiers identified by you or Producers (for example should a bridge financing party identified by you or producers contract with us for a $500,000 bridge loan then the Fixed Compensation due to you shall increase by the amount of $15,000 to $517,025).

      (b)      This letter agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

      (c)      This letter agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this letter agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this letter agreement.

      (d)      The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this letter agreement.

      (e)      This letter agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this letter agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this letter agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

Exhibit ___C___, Pg. _72_

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this letter agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By:_____
     An Authorized Signatory

Accepted and Agreed

224 ENTERTAINMENT, LLC

By:_____
     An Authorized Signatory

2

1

**PROOF OF SERVICE**
1013A(3) C.C.P. Revised 5/1/88

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

    I am employed in the County of Los Angeles, State of California.  I am over the age of

4

18 and not a party to the within action.  My business address is 2049 Century Park East, Suite 2400, Los Angeles, California  90067-2906.

5

    On the date listed below, I served the foregoing document described as:

6

**NOTICE OF ERRATA**

7

**RE:  PLAINTIFF'S COMPLAINT**

8

9

on the interested parties in this action by placing:
       [X] a true and correct copy -OR- [ ] the original document

10

thereof enclosed in sealed envelopes addressed as follows:

11

**Jackoway, Tyerman, Wertheimer, Austen,**　　　**Corporation Service Company**
**Mandelbaum & Morris**　　　　　　　　　　　　　**211 E. 7th Street, Suite 620**

12

**1925 Century Park East, 22nd Floor**　　　　　**Austin, TX 78701**
**Los Angeles, CA 90067**

13

　　　　　　　　　　　　　　　　　　　　　　　**Agent for Service of Process for**
**Agent for Service of Process of**　　　　　　　**Defendant Machete's Chop Shop, Inc.**

14

**Defendant Overnight Productions, LLC**

15

16

**[X]　　VIA PERSONAL SERVICE:**

17

     **[X]**　　I caused such document to be delivered to the offices of the addressee(s), via
          hand delivery.

18

19

    I declare under penalty of perjury under the laws of the State of California that the
above is true and correct.  Executed **February 10, 2010** at Los Angeles, California.

20

21

22

                           _____
                           _H. Hancock_

23

24

25

26

27

28

Exhibit____C____, Pg. 74

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV10- 1501 DSF (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [_] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [_] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐) <br> 224 ENTERTAINMENT, LLC, a Callifornia Limited Liability Company | **DEFENDANTS** <br> AARON KAUFMAN, an individual; RICK SCHWARTZ, an individual; MACHETE'S CHOP SHOP, INC., a Texas corporation; OVERNIGHT PRODUCTIONS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive |
| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br> Martin D. Singer, Esq. (SBN 78166) <br> Todd S. Eagan, Esq. (SBN 207426) <br> Lavely & Singer <br> 2049 Century Park East, Suite 2400, Los Angeles, CA 90067 <br> Telephone No.: (310) 556-3501/Facsimile No. (310) 556-3615 | **Attorneys** (If Known) <br> Michael L. Novicoff, Esq. (SBN 1201330 <br> Daniel R. Gutenplan, Esq. (SBN 260412) <br> Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP <br> 1100 Glendon Avenue, 14th Floor, Los Angeles, California 90024 <br> Telephone No.: (310) 500-3500/Facsimile No.: (310) 500-3501 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify):
- ☐ 6 Multi-District Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** In excess of $ 1,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-. Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

| | |
|---|---|
| **FOR OFFICE USE ONLY:** Case Number: **CV10-01501** | |

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc. <br> www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, California | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York, New Jersey, Texas, Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date March 1, 2010
Daniel R. Gutenplan

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com