1 | **MARTIN D. SINGER, ESQ. (Bar No. 78166)**
**TODD S. EAGAN, ESQ. (Bar No. 207426)**
2 | **LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
3 | 2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
4 | Telephone:  (310) 556-3501
Facsimile: (310) 556-3615
5 | Email: mdsinger@lavelysinger.com
teagan@lavelysinger.com
6 |
7 | Attorneys for Plaintiff
224 Entertainment, LLC
8 |

*(Filed stamp: 2010 APR -6 PM 1:36  CLERK U.S. DISTRICT COURT  CENTRAL DIST. OF CALIF.  LOS ANGELES)*

*(FILED)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| 224 ENTERTAINMENT, LLC, a California Limited Liability Company, | CASE NO. CV 10-1501 DSF (VBKx) |
| Plaintiff, | [Hon. Dale S. Fischer] |
| v. | **FIRST AMENDED COMPLAINT FOR:** |
| AARON KAUFMAN, an individual; RICK SCHWARTZ, an individual; MACHETE'S CHOP SHOP, INC., a Texas corporation; OVERNIGHT PRODUCTIONS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive, | (1)   **BREACH OF CONTRACT;** |
| | (2)   **INTERFERENCE WITH ECONOMIC RELATIONS;** |
| | (3)   **COMMON COUNT IN QUANTUM MERUIT; AND** |
| | (4)   **FRAUD.** |
| Defendants. | **(Complaint Filed:  January 29, 2010** |
| | **Action Removed:   March 1, 2010)** |

Plaintiff 224 ENTERTAINMENT, LLC ("224 Entertainment" and/or "Plaintiff") alleges as follows:

///

1

## SUMMARY OF ACTION

1. *Machete* is a new motion picture starring Robert DeNiro, Steven Seagal, Michelle Rodriquez and Jessica Alba based on the *faux* movie trailer from the 2007 hit *Grindhouse*. It is directed by Robert Rodriguez and produced by Machete's Chop Shop, Inc. ("Machete's Chop Shop") and Overnight Productions, LLC ("Overnight Productions"). Aaron Kaufman ("Kaufman") and Rick Schwartz ("Schwartz") are the principals of Machete's Chop Shop and Overnight Productions.

2. 224 Entertainment acts as an intermediary arranging surety services for motion picture projects. It manages a surety program known as the IBCS Asset-Backed Film Finance Surety Program. Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") are the principals of 224 Entertainment.

3. Beginning in March 2009, 224 Entertainment was sought out by Kaufman, Schwartz, Machete's Chop Shop and Overnight Productions, who requested that 224 Entertainment arrange surety services and bridge financing for *Machete*. 224 Entertainment agreed to do so and was promised fixed and contingent compensation and film credits in return.

4. Despite having successfully arranged surety services and bridge financing for *Machete*, Kaufman, Schwartz, Machete's Chop Shop and Overnight Productions refused to pay 224 Entertainment either the fixed or contingent compensation and to provide the film credits as promised.

## THE PARTIES

5. 224 Entertainment is a California Limited Liability Company, with its principal place of business located in the County of Los Angeles, State of California.

6. Plaintiff is informed and believes, and based thereon alleges, that Defendant Kaufman is, and at all times relevant hereto was, an individual residing

4720-2\FAC 040610

FIRST AMENDED COMPLAINT

1    in the County of New York, State of New York, doing business in the County of

2    Los Angeles, State of California.

3         7.      Plaintiff is informed and believes, and based thereon alleges, that

4    Defendant Schwartz is, and at all times relevant hereto was, an individual residing

5    in the County of New York, State of New York, doing business in the County of

6    Los Angeles, State of California.

7         8.      Plaintiff is informed and believes, and based thereon alleges, that

8    Defendant Machete's Chop Shop is, and at all times relevant hereto was, a Texas

9    corporation, doing business in the County of Los Angeles, State of California.

10        9.      Plaintiff is informed and believes, and based thereon alleges, that

11    Defendant Overnight Productions is, and at all times relevant hereto was, a

12    Delaware limited liability company, doing business in the County of Los Angeles,

13    State of California.

14        10.     Plaintiff is presently unaware of the true names and capacities of

15    Defendants sued herein as Does 1 through 10, inclusive, and therefore sues said

16    Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege

17    the true names and capacities of such fictitiously named Defendants when the

18    same have been ascertained.  Plaintiff is informed and believes and based thereon

19    alleges that each of the fictitiously named Defendants is responsible in some

20    manner for the occurrences, acts and omissions alleged herein and that Plaintiff's

21    damages were proximately caused by their conduct.  Hereinafter all Defendants

22    including Doe Defendants will sometimes be referred to collectively as

23    "Defendants."

24        11.     Plaintiff is informed and believes, and based thereon alleges that at all

25    material times Kaufman, Schwartz, Machete's Chop Shop, Overnight Productions

26    and Does 1 - 10, and each of them, were the agents, employees, partners, joint

27    venturers, co-conspirators, owners, principals, and employers of the other, and

28    each of them are, and at all times herein mentioned were, acting within the course

4720-2\FAC 040610

FIRST AMENDED COMPLAINT

1  and scope of that agency, employment, partnership, conspiracy, ownership or joint

2  venture.  Plaintiff is informed and believes, and based thereon alleges, that the acts

3  and conduct alleged herein were known to, and authorized or ratified by, the

4  officers, directors, and managing agents of each of the Defendants.

5        12.    Plaintiff is informed and believes and based thereon alleges that at all

6  times relevant to this action there existed a unity of interest and ownership among

7  Kaufman and Schwartz, on the one hand, and Machete's Chop Shop and

8  Overnight Productions, on the other hand, such that the individuality and

9  separateness between the individuals and entities ceased, and that if the acts as

10  alleged herein are treated solely as those of Machete's Chop Shop and Overnight

11  Productions alone, an inequitable result will follow because Machete's Chop Shop

12  and Overnight Productions are the alter ego of Kaufman, Schwartz and Does

13  1 - 10.  Further, Kaufman, Schwartz and Does 1 - 10 are legally responsible for the

14  debts and obligations of Machete's Chop Shop and Overnight Productions, in that,

15  among other things: (a) Kaufman, Schwartz and Does 1 - 10 own and control

16  Machete's Chop Shop and Overnight Productions, and Kaufman, Schwartz and

17  Does 1 - 10 at all times relevant hereto directly controlled, dominated, used,

18  managed and operated Machete's Chop Shop and Overnight Productions, and

19  Machete's Chop Shop and Overnight Productions function and operate as a

20  business conduit and alter ego of Kaufman, Schwartz and Does 1 - 10; (b) there

21  was a failure to comply with or observe the formalities of corporate formation

22  and/or operation of Machete's Chop Shop and Overnight Productions; (c) there

23  was a commingling of assets and obligations among Machete's Chop Shop,

24  Overnight Productions, Kaufman, Schwartz and Does 1 - 10; (d) Machete's Chop

25  Shop and Overnight Productions are, and at all times relevant hereto have been,

26  mere shells and shams without sufficient capital assets to meet their debts,

27  obligations and liabilities; and (e) the individuality of Machete's Chop Shop,

28  ///

4

FIRST AMENDED COMPLAINT

Overnight Productions, Kaufman, Schwartz and Does 1 - 10 was and is a total sham and fiction.

## JURISDICTION & VENUE

13.     224 Entertainment is a California limited liability company registered under the laws of the State of California, with its principal place of business in California.  The individual Defendants Kaufman and Schwartz each reside in the State of New York, and the entity Defendants Machete's Chop Shop and Overnight Productions are companies incorporated under the laws of Texas and Delaware, respectively, which maintain their principal places of business in Texas and New York, respectively.  This court has original jurisdiction under 28 USC § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, the sum or value specified by 28 U.S.C. § 1332.

14.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

15.     On or around March 1, 2009, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, met with 224 Entertainment's principal, Parker, in New York.  At the meeting, Kaufman requested that 224 Entertainment arrange a surety bond and bridge financing for *Machete*.  Kaufman and Parker also negotiated the general terms on which 224 Entertainment would be compensated for its services.  Shortly afterward, in Los Angeles, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, met with 224 Entertainment's principal, Gilardi, to further negotiate the general terms on which 224 Entertainment would be compensated for its services.

16.     On or around March 22, 2009, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, contacted 224 Entertainment in Los Angeles and identified a financier for *Machete*, Anthony Gudas of Tax Credit Finance ("Gudas").  According to Kaufman, Gudas was prepared to fund *Machete*.

17.     On or around May 9, 2009, 224 Entertainment arranged a meeting in Washington, D.C. for the purpose of providing additional details about the IBCS Asset-Backed Film Finance Surety Program.  Kaufman and Gudas were in attendance, as were the owner of The IBCS Group, Inc., Edmund Scarborough, and its legal counsel, David Buoncristiani.  At the conclusion of the meeting, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, reconfirmed that they wished to proceed and to utilize the surety services of 224 Entertainment and the IBCS Asset-Backed Film Finance Surety Program.

18.     Following the May 9, 2009 meeting, on July 29, 2009, 224 Entertainment and Machete's Chop Shop entered into a written agreement dated as of May 26, 2009 and thereafter modified on August 4, 2009  (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

19.     Under the Agreement, 224 Entertainment agreed to arrange a surety bond and bridge financing for the production of *Machete*, and to provide the executive producing services of Gilardi and Parker in connection therewith.  The Agreement provided that 224 Entertainment was entitled to payment for arranging surety services and bridge financing upon satisfaction of the following:

- Delivery of the Agreement and Inducement Letter;
- Full compliance by Gilardi and Parker with IRCA requirements;

///

FIRST AMENDED COMPLAINT

1         •     Issuance of a completion bond for *Machete*, with an irrevocable

2              commitment from the financiers of *Machete* to provide funds

3              sufficient to meet the strike price; and

4         •     $150,000 in bridge financing arranged by 224 Entertainment

5              via a third party investor.

6       20.    In return for services provided by 224 Entertainment, Kaufman,

7 individually and on behalf of Schwartz, Machete's Chop Shop and Overnight

8 Productions, promised to pay 224 Entertainment the following:

9         •     $502,025 as fixed compensation on a pay-or-play basis;

10         •     An additional 15% of the net proceeds from *Machete* as

11             contingent compensation; and

12         •     3% of all bridge financing obtained by 224 Entertainment.

13 Also promised were individual executive producer credits for Gilardi and Parker;

14 company credit for 224 Entertainment; reimbursement for travel, lodging and of

15 out-of-pocket costs; and establishment of a collection account management

16 agreement (the "CAM") prior to the completion of principal photography of

17 *Machete* to account to 224 Entertainment directly for its contingent compensation.

18       21.    Based on the Agreement drafted by counsel for Defendants, and the

19 concurrent  representations of Kaufman, individually and on behalf of Schwartz,

20 Machete's Chop Shop and Overnight Productions, whether Machete's Chop Shop

21 ultimately proceeded with the IBCS surety bond arranged by 224 Entertainment

22 was not a condition precedent to payment of the consideration to 224

23 Entertainment for undertaking the work to arrange a surety bond and bridge

24 financing.  This provision was based on the Defendants' recognition and the

25 parties' mutual understanding that 224 Entertainment would expend considerable

26 time and resources to arrange a surety bond and obtain bridge financing for

27 *Machete*, which it did, and that 224 Entertainment was entitled to payment for its

28 ///

FIRST AMENDED COMPLAINT

1  services even in the event that Defendants, for whatever reason, elected not to

2  proceed with the surety bond arranged by 224 Entertainment.

3      22.    Subsequently, in or around late July 2009 in Los Angeles and New

4  York, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop

5  and Overnight Productions, represented to Gilardi and Parker that Gudas had

6  backed out of his agreement to fund *Machete*.  Kaufman reconfirmed to Gilardi

7  and Parker that the Agreement remained in full force and effect.

8      23.    Also at or around that time, Kaufman, individually and on behalf of

9  Schwartz, Machete's Chop Shop and Overnight Productions, represented to

10  Gilardi and Parker that their services were needed to raise emergency bridge

11  financing immediately to support production of *Machete* until a new financier was

12  identified.  Relying on Kaufman's representations that the Agreement remained in

13  full force and effect, 224 Entertainment, with the approval of Kaufman, enlisted

14  business associates and reached out to multiple sources, and through their

15  associates obtained a bridge loan from Peter and Jerry Fruchtman in the amount of

16  $495,000.  Kaufman, individually and on behalf of Schwartz, Machete's Chop

17  Shop and Overnight Productions, confirmed in writing that 224 Entertainment's

18  act of securing the $495,000 bridge loan satisfied the $150,000 bridge financing

19  condition precedent set forth in the Agreement.

20      24.    On or around August 5, 2009, Edmund Scarborough of IBCS

21  executed an agreement whereby he and IBCS agreed to provide Machete's Chop

22  Shop with an asset-backed guarantee on the equity portion of the film financing

23  for *Machete*.

24      25.    Also around that time, Kaufman, individually and on behalf of

25  Schwartz, Machete's Chop Shop and Overnight Productions, requested that 224

26  Entertainment secure an emergency  $3.14 Million bridge loan from Perpetual

27  Media Advisors, LLP ("Perpetual Media").  224 Entertainment promptly

28  facilitated a $3.14 Million loan from Perpetual Media.  Pursuant to the  terms

8

1 | demanded by Perpetual Media, the bridge loan was conditioned on the IBCS
2 | surety bond being placed in escrow for production of *Machete*, which it was.  The
3 | $3.14 emergency bridge loan would not have closed without the IBCS surety bond
4 | which 224 Entertainment arranged, and the production would potentially have
5 | collapsed for lack of funding.

6 |      26.    During the time 224 Entertainment was in the process of obtaining
7 | the Perpetual Media bridge loan,  Kaufman, individually and on behalf of
8 | Schwartz, Machete's Chop Shop and Overnight Productions, reconfirmed to
9 | Gilardi and Parker that under the express terms of the Agreement, 224
10 | Entertainment was entitled to be paid its consideration under the Agreement
11 | regardless of whether Defendants used the IBCS surety bond arranged by 224
12 | Entertainment, or instead proceeded with a completion bond issued by another
13 | surety, given that 224 Entertainment had already undertaken all the necessary
14 | work to successfully arrange the IBCS surety bond  and arranged bridge financing
15 | in excess of $150,000.

16 |      27.    Principal photography of *Machete* commenced on August 9, 2009 and
17 | was completed in late September 2009.  During the period of principal
18 | photography, Defendants abruptly ceased communicating with Gilardi and Parker.
19 | Defendants further failed and refused to schedule and arrange Gilardi and Parker's
20 | location travel.

21 |      28.    On information and belief, in or around November 2009, a
22 | completion bond for *Machete* was issued with an irrevocable commitment from
23 | the financier of *Machete* to provide funds sufficient to meet the strike price.
24 | Despite the fact that 224 Entertainment had successfully arranged the IBCS surety
25 | bond for *Machete* through its expenditure of considerable efforts and resources,
26 | Defendants chose to proceed with a non-IBCS surety. Nevertheless, 224
27 | Entertainment is entitled to payment in full for its services in arranging for a surety
28 | and bridge financing for *Machete* because all necessary conditions had been met,

9

including:  (1) delivery of the Agreement and Inducement Letter; (2) full compliance by Gilardi and Parker with IRCA requirements;(3) the arrangement of at least $150,000 in bridge financing and (4) issuance of a completion bond for *Machete*, with an irrevocable commitment from the financiers of *Machete* to provide funds sufficient to meet the strike price.

29.    Defendants continue to refuse to compensate 224 Entertainment for its services, including payment of fixed compensation, issuance of co-executive producer credits to Gilardi and Parker, company credit for 224 Entertainment, reimbursement for travel expenses, and establishment of the CAM agreement for the collection of monies due to 224 Entertainment as contingent compensation.

30.    As a result of Defendants' conduct, 224 Entertainment has been substantially harmed.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract Against Machete's Chop Shop)**

31.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 30, inclusive, as though fully set forth herein.

32.    As alleged hereinabove, 224 Entertainment and Machete's Chop Shop, Inc. entered into the written Agreement in 2009.  See Exhibit "A," which is incorporated herein by reference.

33.    As set forth in the Agreement, 224 Entertainment agreed to provide surety services and bridge financing for the production of *Machete*, and to provide the executive producing services of Gilardi and Parker in connection therewith, which it did.  The Agreement further provided that 224 Entertainment was entitled to payment for its services upon satisfaction of the following: delivery of the Agreement and Inducement Letter; full compliance by Gilardi and Parker with IRCA requirements; issuance of a completion bond for *Machete*, with an

4720-2\FAC 040610

FIRST AMENDED COMPLAINT

1  irrevocable commitment from the financiers of *Machete* to provide funds
2  sufficient to meet the strike price; and $150,000 in bridge financing obtained by
3  224 Entertainment via a third party bridge financier, each of which have occurred.
4  Whether or not Machete's Chop Shop ultimately proceeded with the IBCS surety
5  bond arranged by 224 Entertainment was not a condition precedent to payment of
6  the money promised to 224 Entertainment.  In other words, payment to 224
7  Entertainment was due on a pay-or-play basis, as expressly set forth in the
8  Agreement.   Thus, in the event a completion bond was issued by an entity other
9  than the IBCS Asset-Backed Film Finance Surety Program, 224 Entertainment was
10  nevertheless entitled to payment.  This provision was based on the Defendants'
11  recognition and the parties' mutual understanding that 224 Entertainment would
12  expend considerable time and resources to arrange a surety bond and obtain bridge
13  financing for *Machete*, which it did, and that 224 Entertainment was entitled to
14  payment for its services even in the event that Defendants, for whatever reason,
15  elected not to proceed with the surety arranged by 224 Entertainment.

16      34.    As set forth in the Agreement, Machete's Chop Shop promised to pay
17  224 Entertainment $502,025 as fixed compensation on a pay-or-play basis; an
18  additional 15% of the company's net proceeds as contingent compensation; and
19  3% of all bridge financing obtained by 224 Entertainment.  Also promised were
20  individual executive producer credits for Gilardi and Parker; company credit;
21  reimbursement for travel, lodging and out-of-pocket costs; and establishment of
22  the CAM agreement to account to 224 Entertainment directly for its contingent
23  compensation.

24      35.    Machete's Chop Shop has materially breached its duties and
25  obligations under the Agreement by failing and refusing to pay 224 Entertainment
26  its fixed compensation, provide film credits for Gilardi, Parker and 224
27  Entertainment, reimburse 224 Entertainment for travel and other out-of-pocket
28  expenses and establish a CAM agreement to account to 224 Entertainment.

11

36.    224 Entertainment has performed all conditions, covenants and promises required pursuant to the terms of the Agreement, except to the extent such performance was waived, excused or prevented by reason of the acts and omissions of Machete's Chop Shop.

37.    As a direct and proximate result of the failure of Machete's Chop Shop to deal fairly and in good faith, 224 Entertainment has suffered and continues to suffer damages in an amount to be proven at trial, but believed to be in excess of One Million Dollars ($1,000,000).  224 Entertainment will seek leave to amend this First Amended Complaint to allege the precise amount when same is ascertained.

## SECOND CAUSE OF ACTION

### (For Interference with Economic Relations Against Kaufman, Schwartz and Overnight Productions)

38.    Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 30 and 32 through 34, inclusive, as though fully set forth herein.

39.    224 Entertainment has a binding and enforceable agreement with Machete's Chop Shop to provide it with surety services and bridge funding for the production of *Machete*, and to provide the executive producing services of Gilardi and Parker in connection therewith, *i.e.*, the Agreement.

40.    Kaufman, Schwartz and Overnight Productions were aware of the binding and enforceable Agreement between 224 Entertainment and Machete's Chop Shop.  On information and belief, despite their awareness of the Agreement between 224 Entertainment and Machete's Chop Shop, and 224 Entertainment's expectation that this contractual relationship would bring substantial economic benefit to 224 Entertainment, Kaufman, Schwartz and Overnight Productions used their position of ownership and control of Machete's Chop Shop to cause

12

1 │ Machete's Chop Shop to refuse to honor the Agreement between 224

2 │ Entertainment and Machete's Chop Shop.

3 │     41.    On information and belief, Machete's Chop Shop breached the

4 │ Agreement with 224 Entertainment at the direction of Kaufman, Schwartz and

5 │ Overnight Productions.

6 │     42.    The actions of Kaufman, Schwartz and Overnight Productions,

7 │ among other things, constitute unfair trade practices in violation of Business and

8 │ Professions Code, Section 17200.

9 │     43.    As a direct and proximate result of those actions of Kaufman,

10 │ Schwartz and Overnight Productions, 224 Entertainment has suffered and

11 │ continues to suffer damages in an amount to be proven at trial, but believed to be

12 │ in excess of One Million Dollars ($1,000,000).  224 Entertainment will seek leave

13 │ to amend this First Amended Complaint to allege the precise amount when same is

14 │ ascertained.

15 │

16 │ **THIRD CAUSE OF ACTION**

17 │ **(For Common Count In Quantum Meruit Against All Defendants)**

18 │     44.    Plaintiff repeats, realleges, adopts and incorporates each and every

19 │ allegation contained in Paragraphs 1 through 30, inclusive, as though fully set

20 │ forth herein.

21 │     45.    In 2009, 224 Entertainment arranged surety services and bridge

22 │ financing for *Machete*. Kaufman, on behalf of himself, Schwartz, Machete's Chop

23 │ Shop and Overnight Productions, requested that 224 Entertainment provide such

24 │ services and promised to pay 224 Entertainment for providing such services,

25 │ including fixed and contingent compensation, executive producer credits and other

26 │ consideration.

27 │     46.    The fair and reasonable value of the services provided by 224

28 │ Entertainment to Defendants is at least $750,000.

47.     No payment has been made by Defendants to 224 Entertainment, and there is now due and owing the sum of at least $750,000.

**FOURTH CAUSE OF ACTION**

**(For Fraud Against All Defendants)**

48.     Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 30, inclusive, as though fully set forth herein.

49.     Beginning on or around March 1, 2009 and continuously thereafter up to and including August 4, 2009 when the Agreement was confirmed in writing, in Los Angeles and New York, Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, made numerous representations to Gilardi and Parker, both verbally and in writing, via email and telephone calls. This included representations that if 224 Entertainment arranged a surety bond and bridge financing for *Machete*, then 224 Entertainment would receive the following: $502,025 as fixed compensation on a pay-or-play basis; an additional 15% of net proceeds from *Machete* as contingent compensation; 3% of all bridge financing obtained by 224 Entertainment; individual executive producer credits and a company credit; reimbursement for travel, lodging and of out-of-pocket costs; and to be added to the CAM agreement for the collection of contingent compensation.   Kaufman, individually and on behalf of Schwartz, Machete's Chop Shop and Overnight Productions, further represented that given the amount of work required for 224 Entertainment to arrange surety services and bridge financing, whether or not Machete's Chop Shop ultimately proceeded with the IBCS surety bond arranged by 224 Entertainment was not a condition precedent to payment of the consideration promised to 224 Entertainment.  Each of these representations were false when made, and Kaufman, on behalf of himself and the ///

14

1 other Defendants, made the representations knowing they were untrue, or

2 recklessly without knowing whether they were true or false.

3      50.    Kaufman, individually and on behalf of Schwartz, Machete's Chop

4 Shop and Overnight Productions, made the representations to Gilardi and Parker

5 with an intent to defraud 224 Entertainment, and for the purpose of inducing 224

6 Entertainment to rely upon them and on that basis enter into the Agreement and

7 perform the work of obtaining a surety and bridge financing for *Machete* under the

8 Agreement.

9      51.    In or around late July 2009, Kaufman, individually and on behalf of

10 Schwartz, Machete's Chop Shop and Overnight Productions, represented to

11 Gilardi and Parker that their services were needed to raise emergency bridge

12 financing immediately to support production of *Machete* until a new financier was

13 identified.  Relying on Kaufman's representations that the Agreement remained in

14 full force and effect, 224 Entertainment, with the approval of Kaufman, enlisted

15 business associates and reached out to multiple sources, and through their

16 associates obtained a bridge loan from Peter and Jerry Fruchtman in the amount of

17 $495,000.  Kaufman, individually and on behalf of Schwartz, Machete's Chop

18 Shop and Overnight Productions, confirmed in writing that 224 Entertainment's

19 act of securing the $495,000 bridge loan satisfied the $150,000 bridge financing

20 condition precedent set forth in the Agreement.

21      52.    Shortly afterward, Kaufman, individually and on behalf of Schwartz,

22 Machete's Chop Shop and Overnight Productions, requested that 224

23 Entertainment secure an emergency  $3.14 Million bridge loan from Perpetual

24 Media.  224 Entertainment promptly facilitated a $3.14 Million bridge loan from

25 Perpetual Media.  Pursuant to the loan terms demanded by Perpetual Media, the

26 bridge loan was conditioned on the IBCS surety bond being placed in escrow for

27 production of *Machete*, which it was.  The $3.14 Million bridge loan would not

28 ///

15

1   have closed without the IBCS surety bond which 224 Entertainment arranged, and

2   the production would have been jeopardized and potentially collapsed.

3        53.    During the time 224 Entertainment was in the process of obtaining

4   the Perpetual Media bridge loan,  Kaufman, individually and on behalf of

5   Schwartz, Machete's Chop Shop and Overnight Productions, represented to

6   Gilardi and Parker, that 224 Entertainment would be entitled to be paid its

7   consideration under the Agreement regardless of whether Defendants used the

8   IBCS surety bond arranged by 224 Entertainment, or instead proceeded with a

9   completion bond issued by another surety, given that 224 Entertainment had and

10  was continuing to undertake the work necessary to successfully arrange the IBCS

11  surety bond  and had arranged emergency bridge financing in excess of $150,000.

12       54.    On information and belief, Kaufman, individually and on behalf of

13  Schwartz, Machete's Chop Shop and Overnight Productions, made these

14  representations as part of a scheme to facilitate a $3.14 Million bridge loan from

15  Perpetual Media and arranged by 224 Entertainment, which was conditioned on

16  the IBCS surety bond being placed in escrow.  At the time Defendants made these

17  representations, Defendants in fact had no intention of paying 224 Entertainment

18  its compensation under the Agreement.

19       55.    Gilardi and Parker were unaware of the falsity of each of the above-

20  described representations and, given the professional reputation of Defendants as

21  experienced film-makers and their assurances to Gilardi and Parker that they

22  would compensate 224 Entertainment for its services, Gilardi and Parker, on

23  behalf of 224 Entertainment, with justification acted in reliance upon the truth of

24  the representations by entering into the Agreement, performing the work of

25  obtaining a surety and bridge financing for *Machete*, and in refraining from

26  pursuing or accepting alternative projects.

27       56.    As a direct and proximate result of its reliance upon the truth of the

28  representations, 224 Entertainment has suffered and continues to suffer damages

16

1  in an amount to be proven at trial, but which is believed to be in excess of One

2  Million Dollars ($1,000,000). 224 Entertainment will seek leave to amend this

3  First Amended Complaint to allege the precise amount when same is ascertained.

4      57.    The aforementioned acts of Defendants, and each of them, were done

5  intentionally or with a conscious disregard of the rights of 224 Entertainment, and

6  with the intent to vex, injure, or annoy 224 Entertainment such as to constitute

7  oppression, fraud, or malice, and that such conduct was authorized, ratified, and

8  adopted by the officers, directors, and/or managing agents of Defendants, and each

9  of them. Thus, 224 Entertainment is entitled to exemplary and punitive damages

10  in an amount appropriate to punish or set an example of Defendants and to deter

11  such conduct by them and others in the future, according to proof at trial.

12

13      **WHEREFORE,** Plaintiff prays for judgment against Defendants, and each

14  of them, jointly and severally, as follows:

15

16  **AS TO THE FIRST CLAIM FOR RELIEF:**

17      1.    For an award of general, special, and consequential damages against

18  Defendants in an amount in excess of the jurisdictional limits of this Court, the

19  exact amount subject to proof at the time of trial, said amount believed to be in

20  excess of One Million Dollars ($1,000,000);

21  **AS TO THE SECOND CLAIM FOR RELIEF:**

22      2.    For an award of general, special, and consequential damages against

23  Defendants in an amount in excess of the jurisdictional limits of this Court, the

24  exact amount subject to proof at the time of trial, said amount believed to be in

25  excess of One Million Dollars ($1,000,000);

26  **AS TO THE THIRD CLAIM FOR RELIEF:**

27      3.    For the principal sum of $750,000 plus interest at the legal rate;

28  ///

17

**AS TO THE FOURTH CLAIM FOR RELIEF:**

4.     For an award of general, special, and consequential damages against Defendants in an amount in excess of the jurisdictional limits of this Court, the exact amount subject to proof at the time of trial, said amount believed to be in excess of One Million Dollars ($1,000,000);

5.     For punitive damages pursuant to Civil Code § 3294 in an amount appropriate to punish or set an example of Defendants, and to deter such conduct in the future, the exact amount of such damages subject to proof at time of trial;

**AS TO ALL CLAIMS FOR RELIEF:**

1.     For costs of suit herein;

2.     For interest on the above-requested general, special and consequential damages at the maximum legal rate as provided by law; and

3.     For such other additional relief as the Court deems just and proper.


DATED: April 5, 2010                    Respectfully submitted,

                                        MARTIN D. SINGER
                                        TODD S. EAGAN
                                        LAVELY & SINGER
                                        PROFESSIONAL CORPORATION


                                        By: _____
                                              TODD S. EAGAN
                                        Attorneys for Plaintiff
                                        224 ENTERTAINMENT, LLC

4720-2\FAC 040610                                   FIRST AMENDED COMPLAINT

# EXHIBIT A

Machete's Chop Shop, Inc.
110 Greene Street, Suite 402
New York, NY 10012

As of May 26, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212

Re:    "Machete" – Executive Producer

Dear Gentlemen,

This letter shall set forth the material terms of the agreement between 224 Entertainment, LLC ("**you**" or "**your**") on the one hand, and Machete's Chop Shop, Inc. ("**we**", "**us**" or "**our**"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "**Producer**" and collectively, "**Producers**") in connection with the motion picture currently titled "Machete" (the "**Picture**").  Subject to our receipt of this Agreement and the Inducement set forth below signed by each Producer, the parties hereby agree as follows:

1.    Condition Precedents.  Our obligations hereunder are subject in all respects to satisfaction of the following conditions precedent:

(a)    Your and each Producer's signature and delivery of this Agreement and the Inducement Letter attached hereto, as applicable;

(b)    Full compliance by each Producer with the IRCA requirements of Paragraph 16(e) of the STC;

(c)    The issuance of a completion bond for the Picture, with an irrevocable commitment from the financiers of the Picture to provide the funds sufficient to meet the "strike price" under such completion bond; and

(d)    Should a bridge financier identified by you or Producers not enter into an agreement with us to provide us with $150,000 or more in bridge financing then the condition precedent of our receipt of the fully executed agreement between Tax Credit Finance, LLC or any other applicable financier ("Loan Provider"), and Edmund C. Scarborough ("Scarborough") and/or The IBCS Group, Inc. (the "Surety") (hereafter Scarborough and Surety collectively and severely referred to as "IBCS") relating to Scarborough's guaranty and Surety's surety bond covering repayment of Loan Provider's principal amount of financing, being utilized by us for the purpose of producing the Picture (the "Surety Bond Agreement") shall apply.  However, to the extent that a bridge financier identified by you or Producers does enter into an agreement with us to provide us with $150,000 or more in bridge financing then absolutely no condition precedent relating to any of Loan Provider, IBCS, Scarborough or the Surety Bond Agreement shall apply to this agreement.  For the removal of all doubt the parties agree that bridge loan financier candidates identified by Producers include but are not limited to Michael Prozer, Elisa Salinas, Burt Ward and Gareth West.

2.    Services.  We hereby engage you to furnish us, and you hereby agree to furnish us the non-exclusive services of each Producer as an executive producer for the Picture, commencing on the date hereof and ending upon the completion of principal photography for the Picture.  Producers shall render those services customarily rendered by executive producers in the motion picture industry.

3.    Compensation.

(a)    Fixed Compensation.  Provided neither you nor Producers are in material breach or uncured default hereunder, we agree to pay and you agree to accept as full and complete consideration

for your and Producer's services hereunder and for all rights transferred by you and Producers to us hereunder, Five Hundred Two Thousand and Twenty-Five Dollars ($502,025) (the "**Fixed Compensation**"), which shall be payable no later than the commencement of principal photography for the Picture (unless otherwise required by the bond company for the Picture), provided that in no event shall the Fixed Compensation be payable to you on a schedule less favorable than the payment schedule for the fixed compensation payable to any other executive producer for the Picture. The Fixed Compensation shall be pay or play upon satisfaction of the conditions precedent. It is further understood between the parties that the Fixed Compensation set forth in this paragraph shall be increased by an amount equal to three percent (3%) of one hundred percent (100%) of the aggregate bridge loan financing contracted between us and any of the bridge financiers identified by you or Producers (for example should a bridge financing party identified by you or Producers contract with us for a $500,000 bridge loan then the Fixed Compensation due to you shall increase by the amount of $15,000 to $517,025).

      (b)    <u>Contingent Compensation</u>. Provided neither you nor Producers are in material breach or default hereunder, we agree to pay you Fifteen Percent (15%) of one hundred percent (100%) of "Company's Net Proceeds," ("Contingent Compensation") which shall be defined, calculated and accounted for on a favored nations basis with all other recipients of Company's Net Proceeds, if any.

      (c)    <u>Collection Account</u>. We acknowledge that prior to the completion of principal photography of the Picture, you and we will enter into a collection account management agreement (the "CAM") with a collection agent (the "Collection Agent") and the Collection Agent will directly account to you for your Contingent Compensation hereunder. Furthermore, you and Producers shall be permitted to be a party to the CAM and receive direct audit and accounting rights, provided that (i) you and Producers negotiate the CAM expeditiously in good faith; and (ii) in the event of a dispute amongst the parties, we shall have final approval over the terms of the CAM.

      (d)    <u>Independent Contractor</u>. You and Producers hereby acknowledge and agree that your services are being provided hereunder as an independent contractor, and accordingly, and pursuant to your request, we shall not withhold, report or pay so-called withholding taxes with respect to the compensation payable hereunder. So-called "withholding taxes" shall include, without limitation, federal and state income taxes, federal social security tax, and New York unemployment insurance tax, if applicable. Should we be subjected to any expense or liability by reason of such failure to withhold, report or pay such taxes (including, but not limited to, penalties, interest or attorney's fees), you and Producers agree that you and Producers will indemnify and hold us harmless therefrom. Accordingly, you and Producers shall, upon our demand, promptly reimburse us for all such expenses.

4.    <u>Credit</u>. Provided neither you nor Producers are in material breach or uncured default hereunder and we produce the Picture, we shall accord you the following credits in connection with the Picture:

      (a)    <u>Individual Credits</u>. We shall accord each Producer an individual executive producer credits (a) in the main titles (whether such main titles appear at the beginning or end of the Picture), on all copies of the Picture, on a separate card shared only with each other in the order of Gilardi then Parker, in a size equal to or greater than the on screen credit accorded to any other individual executive producer for the Picture; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, container and/or jackets thereof in which any other individual is accorded credit; (iii) in the billing block of any paid advertisements for the Picture, wherever any other individual receives credit therein, in a size equal to or greater than the size of any other executive producer credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other executive producer receives credit therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the size of any other executive producer credit appearing therein, in first and second position among all executive producers.

      (b)    <u>Production Company Credit</u>. You shall receive an "in association with" production company credit (i) on all copies of the Picture, on a shared card with other "in association with" credits, if any, otherwise on a separate card, in the main titles; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, containers and/or jackets thereof in which any other production company credit or "in association with" credit appears; (iii) in the billing block of all paid advertisements for the Picture, wherever any other "in associate with" credit appears, in a size equal to or greater than the size of any other "in association with" credit or production company credit appearing

therein; and (iv) in the billing block of any excluded advertisements wherever any other "in association with" credit or production company credit appears therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the "in association with" credit or production company credit accorded to any other production company therein.

(c)     General:  As used herein, "size" shall mean height, width, thickness and duration where applicable; and references to the "main titles" are to the series of credits, whether before or after the body of the Picture, where the "directed by" (as opposed to the "film by") credit appears.  All paid advertising credits shall be subject to the limitations set forth herein and to each distributor's customary exclusions and exceptions, and shall not be applicable with respect to award, nomination or congratulatory ads mentioning only the specific honorees or recipients and ads announcing a personal appearance. All other characteristics of and matters with respect to credits shall be within our sole discretion. No casual or inadvertent failure by us or any distributor of the Picture to comply with the provisions of this Paragraph 4 shall constitute a breach of this Agreement. In the event of any failure by us to comply with the foregoing credit provisions, and upon written notice from you thereof, we shall use meaningful efforts to prospectively cure any such failure which is economically practicable to cure. We shall contractually oblige our North American distributor of the Picture to comply with the foregoing credit obligations and use reasonable efforts to contractually obligate all other remaining licensees to comply with the foregoing credit obligations.

5.      Travel/Accommodations/Expenses:  Provided that neither you or Producers are in uncured material breach of this Agreement, we agree to furnish each Producer with the following production perquisites during the principal photography of the Picture, on an if used basis:  (a) one (1) first class (or best available) round-trip air transportation between each of Producer's primary city of residence and Austin, Texas; (b) reasonable individual accommodations in Austin Texas; (c) ground transportation; (d) a reasonable per diem; (e) a rental car if provided to other producers; (f) a non-exclusive office, which may be shared with each other and other producers; and (g) trailer facilities, which may be shared with each other and other producers. In the event any other producer is provided with more favorable production perquisites than the perquisites set forth in this Paragraph 5 (other than with regard to number of trips to Austin, Texas), then Producers shall receive the benefit of such more favorable perquisites.

6.      Approvals:  Provided you and Producers are not in uncured material default hereunder, you shall have a right to approve of any foreign market sales of the Picture which are less than the estimated "take" prices issued by the sales agent until such time, if ever, that the sales for the Picture are sufficient to recoup any monies due to Loan Provider relating to the Surety Bond Agreement, if applicable, it being understood that: (a) there are several other production lenders loaning money in connection with the Picture (collectively the "Senior Lenders"); (b) Senior Lenders have first priority security interests ahead of Loan Provider; (c) Senior Lenders have a right to approve the foregoing sales of the Picture; and (d) until such time as Senior Lenders have been full and indefeasibly repaid, you hereby waive your right of approval as set forth herein. We shall meaningfully consult with you on all other distribution and business elements (e.g. budget, pre-production/production/post-production schedules, ad campaigns and release pattern, distributors, sales agents and distribution agreements) in connection with the Picture; provided that in the event of a disagreement following good faith conversations, our decision shall control.

7.      Rights.  You hereby agree that all of the results and proceeds of your and Producers services hereunder, including without limitation any materials created by you and/or Producers in connection with the Picture (collectively the "**Work**") shall be prepared within the scope of your and Producer's employment by us and shall be a "work made for hire" for us as specially commissioned for use as a part of a motion picture in accordance with the U.S. Copyright Act.  You and Producers shall execute the Certificate of Results and Proceeds attached hereto as Exhibits "A" and "B" simultaneously with the execution of this Agreement.

8.      Insurance and Indemnity.  We shall add you and Producers as additional insureds on our Errors and Omissions Insurance and general liability insurance policies with respect to the Picture, subject to the limitations, restrictions and terms of said policies.

9.      Premieres.  Each of Producers (and a non-business related companion each) shall be invited to attend each United States "celebrity" premiere, if any, of the Picture, any previews or any screenings of the Picture as well as any "A" list film festivals (*i.e.*, Toronto, Sundance, Berlin, Cannes and Venice) in which

the Picture is screened in competition, on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture. We shall use reasonable efforts to cause the domestic distributor of the Picture to provide Producers' and their non-business related companions with reasonable transportation, accommodations and expenses for Producers only in connection with such premiere and any applicable film festivals on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture; it being understood that no failure by the domestic distributor to provide such transportation, accommodations and per diems shall be a breach of this Agreement

10.    DVD.  Each of Producers shall be provided with a DVD copy (plus Blu-Ray if available) and a one-sheet of the Picture at no charge to you or Producers, if and when such DVD copies and one-sheets become commercially available, for you and Producers' own personal, non-commercial use.

11.    Warranties and Indemnities.

(a)    You and Producers represent that the results and proceeds of your services: (A) are and will be original with you, as applicable, will not be copied in whole or in part from any other work (except such materials as may have been furnished to you by us or that which is in the public domain); (B) that the use of the results and proceeds of your and Producers services by us, or our successors, licensees and assigns in connection with the Picture or in any other way will not infringe upon or violate any copyright; and (C) to the best of your and Producers' knowledge, shall not constitute defamation of, or infringe upon or violate the right of privacy of any common law rights or trademark rights or other rights of any party. In addition, you and Producers represent that neither you nor Producers have made any promises or any commitments to any third party relating to the Picture or the material upon which it is based.

(b)    You and Producers shall indemnify and hold harmless us, our parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs, in connection with any third party claim or action arising out of the breach of any of your representations, warranties, agreements, undertakings or certifications herein. Solely with respect to non-copyright related and non-trademark related claims, the representation stated in this Paragraph 11(b) is made to the best of your and Producers knowledge, including that which you and Producers should have known in the exercise of reasonable prudence.

(c)    We shall indemnify and hold you and Producers harmless against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs incurred by you and Producers and your and Producers' respective parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives as a result of any third party claim or action (other than those arising out of (i) a breach of your and Producers representations, warranties, agreements, undertakings or certifications hereunder, and/or (ii) any criminal act, gross negligence, or willful or reckless misconduct of you and/or Producers; and/or (iii) any breach of any contract by you and/or Producers) arising from our breach of any representation, warranty, undertaking, agreement or certification by us hereunder or our development, production, distribution or exploitation of the Picture (including the exploitation of ancillary rights therein).

12.    Miscellaneous.

(a)    Publicity.  Neither you nor Producers shall participate directly or indirectly in the dissemination of information concerning us (or any of our officers or employees) or the Picture to individuals or media entities without our prior written consent, other than customary, incidental non-derogatory personal references relating to your employment hereunder, provided that, you and Producers may issue personal publicity relating to you and Producers that incidentally makes non-derogatory reference to us and the Picture and your and Producers engagement in connection therewith. We will exercise reasonable good faith efforts to ensure that: (i) your name and Producers' names are included in the initial press announcements relating to the Picture and in subsequent press announcements issued directly by us or our publicists; and (ii) your name and company biography and Producers' names and individual biographies, as provided to us by you and Producers, are included in both the international and

domestic press kits created and issued relating to the Picture; it being understood that no failure by us to comply with the provisions of this Paragraph 12(a) shall be a breach of this Agreement.

(b)    Remedies.  You and Producers acknowledge that in the event of any breach hereunder, you and Producers will be limited to a remedy at law for damages, if any, and neither you nor Producers shall have the right and hereby expressly waive any right you may have to terminate or rescind this Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein.

(c)    Remedies Cumulative.  Except as may be expressly provided to the contrary herein. The parties' various rights and remedies hereunder shall be cumulative and the exercise or enforcement of any one or more of them shall not preclude the enforcing party from exercising or enforcing any of the others or any other right or remedy provided for by law.

(d)    Binding Effect.  This agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

(e)    Counterparts.  This agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this agreement.

(f)    Assignment.  You and Producers agree that our rights with respect to the Work and/or your services may be freely assigned and licensed and in the event of such assignment or license, this Agreement shall remain binding upon you and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing our executory obligations with respect to the rights assigned, such assignment shall constitute a novation and we shall have no further obligations or liabilities hereunder.   In the event of any other assignment by us, we shall remain secondarily liable to you hereunder.

(g)    Notices. Notices hereunder shall be in writing. Any notices and payments hereunder shall be given by personal delivery via reputable overnight courier, by pre-paid mailing or facsimile transmission (with a confirmation copy sent by regular mail). Unless otherwise specified herein, (i) the date of personal delivery or facsimile of such notice or payment, (ii) one (1) business day after deposit with an overnight courier of such notice or payment, or (iii) three (3) business days after the deposit by mail, shall be deemed the date of service of such notice or payment. The names and addresses below concerning notice to all parties hereto shall also be deemed to be the place where payments required under this agreement shall be sent:

To us:                              Machete's Chop Shop, Inc.
                                    15 Mercer Street, Suite 4
                                    New York, NY 10013
                                    Attn: Aaron Kaufman
                                    Fax: (212) 625-0533

With a courtesy copy to:            Schreck Rose Dapello Adams & Hurwitz LLP
                                    1790 Broadway - 20th Floor
                                    New York, New York 10019
                                    Attn: Andrew P. Hurwitz, Esq. &
                                        Alan D. Sacks, Esq.
                                    Fax: (212) 832-2969

To you:                             224 Entertainment, LLC
                                    C/o ICM
                                    10250 Constellation Blvd.
                                    Los Angeles, CA 90067

Attn: Jack Gilardi, Sr.
Fax: (310) 248-4613

With a courtesy (facsimile only) copy to:    1025 Riverland Woods Place, Ste, 521
Charleston, SC 29412
Attn: Darby Parker
Fax: (323) 446-7666

(h)   <u>Subsequent Productions</u>.  In the event that we (or our licensee, designee, assignee, affiliate (including, without limitation, Weekend (defined below) or Overnight (defined below) or successor-in-interest with respect to the Picture) acquire any derivative and/or subsequent production rights based on the Picture and initiate any such derivative and/or subsequent production (and provided that (i) neither you, Gilardi nor Parker are in material breach or uncured default hereunder or (ii) Gilardi and Parker are not then executives of so-called "major," mini-major" or "major independent" motion picture production and/or distribution and/or exhibition companies), you, Gilardi and Parker shall have the right of first negotiation, for a period of 30 business days from the date of your receipt of notice by us, to be engaged as executive producers on the first of any and all such derivative and/or subsequent productions, in any and all media (provided that if such derivative and/or subsequent production is intended for a network television series, your, Gilardi's and Parker's engagements would be subject to network approval), which rights shall be on a rolling basis, and, if such derivative and/or subsequent production has a budget anticipated to be equal to or greater than the budget of the Picture, on all financial terms and conditions which are no less favorable than those set forth in this Agreement, but in any case the fixed compensation, contingent compensation and contingent deferment, respectively, payable to you for such derivative and/or subsequent production shall be equal to no less than the relative proportional amount as your fixed compensation, contingent compensation and contingent deferment, if any, on the Picture bears to the fixed compensation, contingent compensation and contingent deferment, if any, respectively, paid to, in the aggregate, Overnight Productions, LLC ("Overnight"), Weekend, LLC ("Weekend"), Aaron Kaufman ("Kaufman"), and Rick Schwartz ("Schwartz," collectively, the "Owner Parties") (and/or Kaufman's, Schwartz's, Weekend's and Overnight's respective loan out company or companies, trusts, respective parents, affiliates, subsidiaries or successors), for services rendered in connection with the Picture.  In addition, your fixed compensation will be paid on a no less favorable schedule than set forth herein, and your contingent compensation and contingent deferment will be defined, calculated and paid on the same basis as the Owner Parties' contingent compensation and contingent deferment, respectively.

(i)   <u>Further Instruments/Choice of Law</u>.  The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this agreement.  This agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

[SIGNATURES ON THE NEXT PAGE]

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this Agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By: _____
An Authorized Signatory

Accepted and Agreed

224 ENTERTAINMENT, LLC

By: _____
An Authorized Signatory

I, Jack Gilardi, Jr. have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____Jack Gilardi, Jr._____

Signature:_____

I, Darby Parker have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____Darby Parker_____

Signature:_____

Exhibit A

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
### (the "Certificate")

PICTURE:                   "Machete" (the "Picture")

LENDER:                 224 Entertainment, LLC ("Lender")

PRODUCER:          Jack Gilardi, Jr.

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of May 26, 2009 (the "Agreement"):

(i)       For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(ii)     Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement.  If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)    Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)    Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)     Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network  (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder.  In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of   ___07/29/09___.


224 Entertainment, LLC ("Lender")


By:_____

Its:____Jack Gilardi, Jr., Member_____


_____
Jack Gilardi, Jr. ("Producer")

<u>Exhibit B</u>

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
### (the "Certificate")

PICTURE:            "Machete" (the "Picture")

LENDER:             224 Entertainment, LLC ("Lender")

PRODUCER:           Darby Parker

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of May 26, 2009 (the "Agreement"):

(i)     For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(iii)   Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement.  If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice**,** Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)   Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)    Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

**29**

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)    Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder. In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of   __07/29/09____.

224 Entertainment, LLC ("Lender")

By:_____

Its:___Darby Parker, Member_____

Darby Parker ("Producer")

Machete's Chop Shop, Inc.
110 Greene Street, Suite 402
New York, NY 10012

As of July 28, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212

Re:   "Machete" -- Executive Producer

Dear Gentlemen,

This letter shall set forth the material terms of the agreement between 224 Entertainment, LLC ("**you**" or "**your**") on the one hand, and Machete's Chop Shop, Inc. ("**we**", "**us**" or "**our**"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "**Producer**" and collectively, "**Producers**") in connection with the motion picture currently titled "Machete" (the "**Picture**"). Subject to our receipt of this Agreement and the Inducement set forth below signed by each Producer, the parties hereby agree as follows:

1.      Condition Precedents.  Our obligations hereunder are subject in all respects to satisfaction of the following conditions precedent:

        (a)     Your and each Producer's signature and delivery of this Agreement and the Inducement Letter attached hereto, as applicable;

        (b)     Full compliance by each Producer with the IRCA requirements of Paragraph 16(e) of the STC;

        (c)     The issuance of a completion bond for the Picture, with an irrevocable commitment from the financiers of the Picture to provide the funds sufficient to meet the "strike price" under such completion bond; and

        (d)     Should a bridge financier identified by you or Producers not enter into an agreement with us to provide us with $150,000 or more in bridge financing then the condition precedent of our receipt of the fully executed agreement between Tax Credit Finance, LLC or any other applicable financier ("Loan Provider"), and Edmund C. Scarborough ("Scarborough") and/or The IBCS Group, Inc. (the "Surety") (hereafter Scarborough and Surety collectively and severely referred to as "IBCS") relating to Scarborough's guaranty and Surety's surety bond covering repayment of Loan Provider's principal amount of financing, being utilized by us for the purpose of producing the Picture (the "Surety Bond Agreement") shall apply.  However, to the extent that a bridge financier identified by you or Producers does enter into an agreement with us to provide us with $150,000 or more in bridge financing then absolutely no condition precedent relating to any of Loan Provider, IBCS, Scarborough or the Surety Bond Agreement shall apply to this agreement.  For the removal of all doubt the parties agree that bridge loan financier candidates identified by Producers include but are not limited to Michael Prozer, Elisa Salinas, Burt Ward and Gareth West.

2.      Services.  We hereby engage you to furnish us, and you hereby agree to furnish us the non-exclusive services of each Producer as an executive producer for the Picture, commencing on the date hereof and ending upon the completion of principal photography for the Picture.  Producers shall render those services customarily rendered by executive producers in the motion picture industry.

3.      Compensation.

        (a)     Fixed Compensation.  Provided neither you nor Producers are in material breach or uncured default hereunder, we agree to pay and you agree to accept as full and complete consideration

FKKS: 379014.v2                                                                          18749.300

for your and Producer's services hereunder and for all rights transferred by you and Producers to us hereunder, Five Hundred Two Thousand and Twenty-Five Dollars ($502,025) (the "**Fixed Compensation**"), which shall be payable no later than the commencement of principal photography for the Picture (unless otherwise required by the bond company for the Picture), provided that in no event shall the Fixed Compensation be payable to you on a schedule less favorable than the payment schedule for the fixed compensation payable to any other executive producer for the Picture. The Fixed Compensation shall be pay or play upon satisfaction of the conditions precedent.

(b)      Contingent Compensation.  Provided neither you nor Producers are in material breach or default hereunder, we agree to pay you Fifteen Percent (15%) of one hundred percent (100%) of "Company's Net Proceeds," ("Contingent Compensation") which shall be defined, calculated and accounted for on a favored nations basis with all other recipients of Company's Net Proceeds, if any.

(c)      Collection Account.   We acknowledge that prior to the completion of principal photography of the Picture, you and we will enter into a collection account management agreement (the "CAM") with a collection agent (the "Collection Agent") and the Collection Agent will directly account to you for your Contingent Compensation hereunder. Furthermore, you and Producers shall be permitted to be a party to the CAM and receive direct audit and accounting rights, provided that (i) you and Producers negotiate the CAM expeditiously in good faith; and (ii) in the event of a dispute amongst the parties, we shall have final approval over the terms of the CAM.

(d)      Independent Contractor.  You and Producers hereby acknowledge and agree that your services are being provided hereunder as an independent contractor, and accordingly, and pursuant to your request, we shall not withhold, report or pay so-called withholding taxes with respect to the compensation payable hereunder.  So-called "withholding taxes" shall include, without limitation, federal and state income taxes, federal social security tax, and New York unemployment insurance tax, if applicable.  Should we be subjected to any expense or liability by reason of such failure to withhold, report or pay such taxes (including, but not limited to, penalties, interest or attorney's fees), you and Producers agree that you and Producers will indemnify and hold us harmless therefrom. Accordingly, you and Producers shall, upon our demand, promptly reimburse us for all such expenses.

4.      Credit.  Provided neither you nor Producers are in material breach or uncured default hereunder and we produce the Picture, we shall accord you the following credits in connection with the Picture:

(a)      Individual Credits.  We shall accord each Producer an individual executive producer credits (a) in the main titles (whether such main titles appear at the beginning or end of the Picture), on all copies of the Picture, on a separate card shared only with each other in the order of Gilardi then Parker, in a size equal to or greater than the on screen credit accorded to any other individual executive producer for the Picture; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, container and/or jackets thereof in which any other individual is accorded credit; (iii) in the billing block of any paid advertisements for the Picture, wherever any other individual receives credit therein, in a size equal to or greater than the size of any other executive producer credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other executive producer receives credit therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the size of any other executive producer credit appearing therein, in first and second position among all executive producers.

(b)      Production Company Credit.  You shall receive an "in association with" production company credit (i) on all copies of the Picture, on a shared card with other "in association with" credits, if any, otherwise on a separate card, in the main titles; (ii) in the billing block portion of any DVD and other home video or soundtrack albums and the covers, packages, containers and/or jackets thereof in which any other production company credit or "in association with" credit appears; (iii) in the billing block of all paid advertisements for the Picture, wherever any other "in associate with" credit appears, in a size equal to or greater than the size of any other "in association with" credit or production company credit appearing therein; and (iv) in the billing block of any excluded advertisements wherever any other "in association with" credit or production company credit appears therein (except congratulatory, nomination and award ads mentioning only the subject honoree), in a size equal to or greater than the "in association with" credit or production company credit accorded to any other production company therein.

(c) .    General:  As used herein, "size" shall mean height, width, thickness and duration where applicable; and references to the "main titles" are to the series of credits, whether before or after the body of the Picture, where the "directed by" (as opposed to the "film by") credit appears.  All paid advertising credits shall be subject to the limitations set forth herein and to each distributor's customary exclusions and exceptions, and shall not be applicable with respect to award, nomination or congratulatory ads mentioning only the specific honorees or recipients and ads announcing a personal appearance.  All other characteristics of and matters with respect to credits shall be within our sole discretion. No casual or inadvertent failure by us or any distributor of the Picture to comply with the provisions of this Paragraph 4 shall constitute a breach of this Agreement. In the event of any failure by us to comply with the foregoing credit provisions, and upon written notice from you thereof, we shall use meaningful efforts to prospectively cure any such failure which is economically practicable to cure. We shall contractually oblige our North American distributor of the Picture to comply with the foregoing credit obligations and use reasonable efforts to contractually obligate all other remaining licensees to comply with the foregoing credit obligations.

5.      Travel/Accommodations/Expenses:  Provided that neither you or Producers are in uncured material breach of this Agreement, we agree to furnish each Producer with the following production perquisites during the principal photography of the Picture, on an if used basis:  (a) one (1) first class (or best available) round-trip air transportation between each of Producer's primary city of residence and Austin, Texas; (b) reasonable individual accommodations in Austin Texas; (c) ground transportation; (d) a reasonable per diem; (e) a rental car if provided to other producers; (f) a non-exclusive office, which may be shared with each other and other producers; and (g) trailer facilities, which may be shared with each other and other producers. In the event any other producer is provided with more favorable production perquisites than the perquisites set forth in this Paragraph 5 (other than with regard to number of trips to Austin, Texas), then Producers shall receive the benefit of such more favorable perquisites.

6.      Approvals:  Provided you and Producers are not in uncured material default hereunder, you shall have a right to approve of any foreign market sales of the Picture which are less than the estimated "take" prices issued by the sales agent until such time, if ever, that the sales for the Picture are sufficient to recoup any monies due to Loan Provider relating to the Surety Bond Agreement, if applicable, it being understood that: (a) there are several other production lenders loaning money in connection with the Picture (collectively the "Senior Lenders"); (b) Senior Lenders have first priority security interests ahead of Loan Provider; (c) Senior Lenders have a right to approve the foregoing sales of the Picture; and (d) until such time as Senior Lenders have been full and indefeasibly repaid, you hereby waive your right of approval as set forth herein. We shall meaningfully consult with you on all other distribution and business elements (e.g. budget, pre-production/production/post-production schedules, ad campaigns and release pattern, distributors, sales agents and distribution agreements) in connection with the Picture; provided that in the event of a disagreement following good faith conversations, our decision shall control.

7.      Rights.  You hereby agree that all of the results and proceeds of your and Producers services hereunder, including without limitation any materials created by you and/or Producers in connection with the Picture (collectively the "**Work**") shall be prepared within the scope of your and Producer's employment by us and shall be a "work made for hire" for us as specially commissioned for use as a part of a motion picture in accordance with the U.S. Copyright Act.  You and Producers shall execute the Certificate of Results and Proceeds attached hereto as Exhibits "A" and "B" simultaneously with the execution of this Agreement.

8.      Insurance and Indemnity.  We shall add you and Producers as additional insureds on our Errors and Omissions Insurance and general liability insurance policies with respect to the Picture, subject to the limitations, restrictions and terms of said policies.

9.      Premieres.  Each of Producers (and a non-business related companion each) shall be invited to attend each United States "celebrity" premiere, if any, of the Picture, any previews or any screenings of the Picture as well as any "A" list film festivals (*i.e.*, Toronto, Sundance, Berlin, Cannes and Venice) in which the Picture is screened in competition, on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture. We shall use reasonable efforts to cause the domestic distributor of the Picture to provide Producers' and their non-business related companions with reasonable transportation, accommodations and expenses for Producers only in connection with such premiere and any

applicable film festivals on a most favored nations basis as between each of Producers and (excluding Robert Rodriguez and Elizabeth Avellan) our designated producers and any other individual producer rendering services on the Picture; it being understood that no failure by the domestic distributor to provide such transportation, accommodations and per diems shall be a breach of this Agreement.

10.     DVD.  Each of Producers shall be provided with a DVD copy (plus Blu-Ray if available) and a one-sheet of the Picture at no charge to you or Producers, if and when such DVD copies and one-sheets become commercially available, for you and Producers' own personal, non-commercial use.

11.     Warranties and Indemnities.

        (a)     You and Producers represent that the results and proceeds of your services: (A) are and will be original with you, as applicable, will not be copied in whole or in part from any other work (except such materials as may be been furnished to you by us or that which is in the public domain); (B) that the use of the results and proceeds of your and Producers services by us, or our successors, licensees and assigns in connection with the Picture or in any other way will not infringe upon or violate any copyright; and (C) to the best of your and Producers' knowledge, shall not constitute defamation of, or infringe upon or violate the right of privacy of any common law rights or trademark rights or other rights of any party. In addition, you and Producers represent that neither you nor Producers have made any promises or any commitments to any third party relating to the Picture or the material upon which it is based.

        (b)     You and Producers shall indemnify and hold harmless us, our parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs, in connection with any third party claim or action arising out of the breach of any of your representations, warranties, agreements, undertakings or certifications herein. Solely with respect to non-copyright related and non-trademark related claims, the representation stated in this Paragraph 11(b) is made to the best of your and Producers knowledge, including that which you and Producers should have known in the exercise of reasonable prudence.

        (c)     We shall indemnify and hold you and Producers harmless against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs incurred by you and Producers and your and Producers' respective parents, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives as a result of any third party claim or action (other than those arising out of (i) a breach of your and Producers representations, warranties, agreements, undertakings or certifications hereunder, and/or (ii) any criminal act, gross negligence, or willful or reckless misconduct of you and/or Producers; and/or (iii) any breach of any contract by you and/or Producers) arising from our breach of any representation, warranty, undertaking, agreement or certification by us hereunder or our development, production, distribution or exploitation of the Picture (including the exploitation of ancillary rights therein).

12.     Miscellaneous.

        (a)     Publicity.  Neither you nor Producers shall participate directly or indirectly in the dissemination of information concerning us (or any of our officers or employees) or the Picture to individuals or media entities without our prior written consent, other than customary, incidental non-derogatory personal references relating to your employment hereunder, provided that, you and Producers may issue personal publicity relating to you and Producers that incidentally makes non-derogatory reference to us and the Picture and your and Producers engagement in connection therewith. We will exercise reasonable good faith efforts to ensure that: (i) your name and Producers' names are included in the initial press announcements relating to the Picture and in subsequent press announcements issued directly by us or our publicists; and (ii) your name and company biography and Producers' names and individual biographies, as provided to us by you and Producers, are included in both the international and domestic press kits created and issued relating to the Picture; it being understood that no failure by us to comply with the provisions of this Paragraph 12(a) shall be a breach of this Agreement.

        (b)     Remedies.  You and Producers acknowledge that in the event of any breach hereunder, you and Producers will be limited to a remedy at law for damages, if any, and neither you nor Producers shall have the right and hereby expressly waive any right you may have to terminate or rescind this

Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein.

      (c)    <u>Remedies Cumulative</u>.  Except as may be expressly provided to the contrary herein. The parties' various rights and remedies hereunder shall be cumulative and the exercise or enforcement of any one or more of them shall not preclude the enforcing party from exercising or enforcing any of the others or any other right or remedy provided for by law.

      (d)    <u>Binding Effect</u>.  This agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

      (e)    <u>Counterparts</u>.  This agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this agreement.

      (f)    <u>Assignment</u>.  You and Producers agree that our rights with respect to the Work and/or your services may be freely assigned and licensed and in the event of such assignment or license, this Agreement shall remain binding upon you and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or television network (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing our executory obligations with respect to the rights assigned, such assignment shall constitute a novation and we shall have no further obligations or liabilities hereunder.   In the event of any other assignment by us, we shall remain secondarily liable to you hereunder.

      (g)    <u>Notices</u>. Notices hereunder shall be in writing. Any notices and payments hereunder shall be given by personal delivery via reputable overnight courier, by pre-paid mailing or facsimile transmission (with a confirmation copy sent by regular mail). Unless otherwise specified herein, (i) the date of personal delivery or facsimile of such notice or payment, (ii) one (1) business day after deposit with an overnight courier of such notice or payment, or (iii) three (3) business days after the deposit by mail, shall be deemed the date of service of such notice or payment. The names and addresses below concerning notice to all parties hereto shall also be deemed to be the place where payments required under this agreement shall be sent:

| | |
|---|---|
| To us: | Machete's Chop Shop, Inc.<br>15 Mercer Street, Suite 4<br>New York, NY 10013<br>Attn: Aaron Kaufman<br>Fax: (212) 625-0533 |
| With a courtesy copy to: | Schreck Rose Dapello Adams & Hurwitz LLP<br>1790 Broadway - 20th Floor<br>New York, New York 10019<br>Attn: Andrew P. Hurwitz, Esq. &<br>     Alan D. Sacks, Esq.<br>Fax: (212) 832-2969 |
| To you: | 224 Entertainment, LLC<br>C/o ICM<br>10250 Constellation Blvd.<br>Los Angeles, CA 90067<br>Attn: Jack Gilardi, Sr.<br>Fax: (310) 248-4613 |
| With a courtesy (facsimile only) copy to: | 1025 Riverland Woods Place, Ste, 521<br>Charleston, SC 29412<br>Attn: Darby Parker |

Fax: (323) 446-7666

(h) <u>Subsequent Productions</u>.  In the event that we (or our licensee, designee, assignee, affiliate (including, without limitation, Weekend (defined below) or Overnight (defined below) or successor-in-interest with respect to the Picture) acquire any derivative and/or subsequent production rights based on the Picture and initiate any such derivative and/or subsequent production (and provided that (i) neither you, Gilardi nor Parker are in material breach or uncured default hereunder or (ii) Gilardi and Parker are not then executives of so-called "major," mini-major" or "major independent" motion picture production and/or distribution and/or exhibition companies), you, Gilardi and Parker shall have the right of first negotiation, for a period of 30 business days from the date of your receipt of notice by us, to be engaged as executive producers on the first of any and all such derivative and/or subsequent productions, in any and all media (provided that if such derivative and/or subsequent production is intended for a network television series, your, Gilardi's and Parker's engagements would be subject to network approval), which rights shall be on a rolling basis, and, if such derivative and/or subsequent production has a budget anticipated to be equal to or greater than the budget of the Picture, on all financial terms and conditions which are no less favorable than those set forth in this Agreement, but in any case the fixed compensation, contingent compensation and contingent deferment, respectively, payable to you for such derivative and/or subsequent production shall be equal to no less than the relative proportional amount as your fixed compensation, contingent compensation and contingent deferment, if any, on the Picture bears to the fixed compensation, contingent compensation and contingent deferment, if any, respectively, paid to, in the aggregate, Overnight Productions, LLC ("Overnight"), Weekend, LLC ("Weekend"), Aaron Kaufman ("Kaufman"), and Rick Schwartz ("Schwartz," collectively, the "Owner Parties") (and/or Kaufman's, Schwartz's, Weekend's and Overnight's respective loan out company or companies, trusts, respective parents, affiliates, subsidiaries or successors), for services rendered in connection with the Picture.  In addition, your fixed compensation will be paid on a no less favorable schedule than set forth herein, and your contingent compensation and contingent deferment will be defined, calculated and paid on the same basis as the Owner Parties' contingent compensation and contingent deferment, respectively.

(i) <u>Further Instruments/Choice of Law</u>.  The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this agreement.  This agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this Agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By:_____
         An Authorized Signatory

Accepted and Agreed

224 ENTERTAINMENT, LLC

By: _____
         An Authorized Signatory

I, Jack Gilardi, Jr. have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____JACK GILARDI, JR._____

Signature:_____

I, Darby Parker have read and am familiar with all the terms of the foregoing agreement between Machete's Chop Shop, Inc. ("Company") and 224 Entertainment, LLC ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.

Name:_____DARBY PARKER_____

Signature:_____

Exhibit A

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
### (the "Certificate")

PICTURE:              "Machete" (the "Picture")

LENDER:               224 Entertainment, LLC ("Lender")

PRODUCER:             Jack Gilardi, Jr.

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of July 28, 2009 (the "Agreement"):

(i)     For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of  "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(ii)    Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement.  If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)   Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)    Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

FKKS: 379014.v2                                                                                    18749.300

**38**

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)    Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network  (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder.  In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of ____08/04/09____.

224 Entertainment, LLC ("Lender")

By:_____

Its:_____JACK GILARDI, JR., Member_____

_____
Jack Gilardi, Jr. ("Producer")

Exhibit B

## CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS
### (the "Certificate")

PICTURE:                    "Machete" (the "Picture")

LENDER:                     224 Entertainment, LLC ("Lender")

PRODUCER:                   Darby Parker

The undersigned ("Producer") hereby agrees and certifies that in connection with the agreement between Lender and Machete's Chop Shop, Inc. ("Company") dated as of July 28, 2009 (the "Agreement"):

(i)     For good and valuable consideration, the receipt of which is hereby acknowledged, all results and proceeds of the services of Lender and Producer in connection with the Picture (hereinafter, the "Work") constitute, within the meaning of the copyright laws of the United States, a "work made for hire" for Company prepared within the scope of Lender and Producer's employment and/or as a work specially ordered or commissioned for use as a part of a motion-picture or other audio-visual work and, as between Company, Lender and Producer, Company owns all right, title and interest in and to the Work and the Picture exclusively, in perpetuity, in all media, and throughout the universe for all purposes, including, without limitation, any rights arising under the copyright laws of the United States of America or any other jurisdiction. The payments made by Company or its assignees under the Agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to any directive, enabling or implementing legislation, laws and regulations enacted by any nation throughout the world, including the member nations of the European Union. Lender and Producer hereby waive all rights of  "Droit Moral" or "Moral Rights of Authors" or any similar rights or principles of law which Lender and/or Producer may now or later have in the Work;

(iii)   Without limiting the generality of the foregoing, insofar as the undersigned may possess any right, title and interest in and to the Work, the undersigned hereby irrevocably assigns any and all such right, title and interest to Company.  Lender and Producer shall, at the request of Company, execute and deliver to Company such assignments or other instruments, consistent with the terms hereof and under the Agreement, as Company may deem reasonably necessary to establish, protect, enforce and/or defend any or all of Company's rights in the Work or under this Agreement.  If Lender and/or Producer shall not so execute and deliver any such instrument after reasonable notice, Company shall have the right to do so in the undersigned's name, place and stead, and Company is hereby irrevocably appointed Lender and Producer's attorney-in-fact for such purposes, which power is coupled with an interest.  If Company signs any documents as Lender and Producer's attorney-in-fact, Company will promptly provide Lender with copies of any such documents; it being understood that no failure by Company to do so shall be a breach of this Certificate or the Agreement;

(iii)   Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Producer's name, approved likeness and approved biography in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture, and/or subsidiary and ancillary rights of any nature relating thereto and/or Lender and Producer's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming) and provided that neither Lender nor Producer will be represented as directly or indirectly endorsing any product other than the Picture. Company shall not authorize use of direct endorsements by Producer of any product (other than the Picture) without Producer's prior written consent (not to be unreasonably withheld).  The use of any materials from the Picture in conjunction with the advertising of any services or products shall not be considered an endorsement;

(iv)    Lender and Producer acknowledge that: (i) in the event of any breach hereunder, or any breach of the Agreement, by Company, Lender and Producer will be limited to a remedy at law for

FKKS: 379014.v2                                                                              18749.300

**40**

damages, if any, and neither Lender nor Producer will have the right, and each hereby expressly waives any right Lender and/or Producer may have to terminate or rescind this Certificate or the Agreement or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein; (ii) nothing herein shall obligate Company to use Lender and/or Producer's services or the results or proceeds thereof in the Picture or to produce, advertise or distribute the Picture; and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein; and

(v)     Lender and Producer agree that Company's rights with respect to the Work and/or Lender and Producer's services may be freely assigned and licensed and in the event of such assignment or license, this Certificate shall remain binding upon Lender and Producer and inure to the benefit of any such assignee or licensee. In the event of any assignment to any company(ies) related or subsidiary to or affiliated with a "major" or "mini-major" motion picture company or U.S. television network  (as such terms are commonly understood in the entertainment industry), and provided such company assumes in writing the executory obligations of the Company with respect to the rights assigned, such assignment shall constitute a novation and Company shall have no further obligations or liabilities hereunder.  In the event of any other assignment by Company, Company shall remain secondarily liable to Lender and Producer hereunder and under the Agreement.

IN WITNESS WHEREOF, this document was executed as of  08/04/09     .


224 Entertainment, LLC ("Lender")

By:_____

Its:____DARBY PARKER, Member_____


_____
Darby Parker ("Producer")

**Machete's Chop Shop, Inc.**
15 Mercer Street, Suite 4
New York, NY 10013

As of July 28, 2009

224 Entertainment, LLC
9454 Wilshire Blvd.
4th Floor
Beverly Hills, CA 90212
Attn: Darby Parker & Jack Gilardi, Jr.

Re:   "Machete"

Dear Gentlemen,

Reference is herein made to that certain agreement (the "**EP Agreement**") between 224 Entertainment, LLC ("**you**" or "**your**") on the one hand, and Machete's Chop Shop, Inc. ("**we**", "**us**" or "**our**"), on the other hand, with respect to the executive producing services of Jack Gilardi, Jr. ("Gilardi") and Darby Parker ("Parker") (individually "**Producer**" and collectively, "**Producers**") in connection with the motion picture currently titled "Machete" (the "**Picture**").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

(a)     The Fixed Compensation (as such term is defined in the EP Agreement) set forth in Paragraph 3(a) of the EP Agreement shall be increased by an amount equal to three percent (3%) of one hundred percent (100%) of the aggregate bridge loan financing contracted between us and any of the bridge financiers identified by you or Producers (for example should a bridge financing party identified by you or producers contract with us for a $500,000 bridge loan then the Fixed Compensation due to you shall increase by the amount of $15,000 to $517,025).

(b)     This letter agreement and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

(c)     This letter agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this letter agreement via facsimile transmission shall be effective as delivery of manually executed counterpart of this letter agreement.

(d)     The parties hereto agree to expeditiously execute, acknowledge and deliver to each other any and all additional documents or instruments that any party requests to fully effectuate and carry out the intent and purposes of this letter agreement.

(e)     This letter agreement is entered into in the State of New York, shall be governed by the laws of such state, and any disputes arising hereunder shall be adjudicated in the courts of such state. If any legal action, arbitration or other proceeding is brought for the enforcement of this letter agreement, or because of any dispute, alleged breach, default or misrepresentation in connection with this letter agreement, the successful or prevailing party shall be entitled to recover reasonable outside attorneys' fees and other costs that it incurred in that action, arbitration or other proceeding, in addition to any other relief to which it may be entitled.

**42**

By signing in the spaces below, you and we accept and agree to all of the terms and conditions of this letter agreement.

Sincerely,

MACHETE'S CHOP SHOP, INC.

By:_____
     An Authorized Signatory

Accepted and Agreed

224 ENTERTAINMENT, LLC

By:_____
     An Authorized Signatory

2

**43**